## CHESAPEAKE AND POTOMAC TELEPHONE COMPANY *v.* MANNING.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 363. Argued March 10, 11, 1902.—Decided June 2, 1902.

The Court of Appeals made a complete disposition of the controversy in this case, and all that was left for the Supreme Court was the ministerial duty of entering a final injunction in the language of the preliminary order, with the proviso that it should operate until such time in the future as the defendant should voluntarily withdraw from business in the District of Columbia; and this was clearly a final decree.

Courts always presume that a legislature in enacting statutes acts advisedly and with full knowledge of the situation, and they must accept its action as that of a body having full power to act, and only acting when it has acquired sufficient information to justify its action.

While a legislature may prescribe regulations for the management of business of a public nature, even though carried on by private corporations, with private capital, and for private benefit, the language of such regulations will not be broadened by implication.

The decree as directed by the Court of Appeals was erroneous, and cast a burden upon the defendant to which it was not subjected by the legislation of Congress.

On July 14, 1898, the appellees commenced this suit in the Supreme Court of the District of Columbia, to restrain the defendant from discontinuing its telephone service to them.

Their bill alleged that the defendant was a corporation organized under the laws of the State of New York, and for a long time past engaged in the business of furnishing telephone

exchange service in the District of Columbia; that with the assent and under the direction of the Congress of the United States and the Commissioners of the District of Columbia it was occupying the streets, avenues and alleys of the city of Washington with its conduits and electric wires; that the plaintiffs had a contract with the defendant for such service, terminable by either party upon ten days' notice in writing; that on July 2 they gave notice of their intention to terminate such contract. The bill further alleged the passage by Congress on June 30, 1898, of an act limiting the charges for telephone service; that they desired to continue the use of the telephone service furnished by defendant, and had tendered the amount required to be paid under the act of Congress, but that nevertheless the defendant threatened to remove the telephone and its appliances now in the premises of plaintiffs and to discontinue its telephone service to them.

The defendant answered admitting its incorporation, its business of furnishing telephone service, the passage of the act of Congress, set forth its contract with the complainants and the correspondence in reference to the termination of the contract, and alleged that the act of Congress had no application to any individual desiring telephone service, but only to such service as might be rendered for the public to the District of Columbia; that if it did apply to individuals desiring telephone service the act was beyond the power of Congress, inasmuch as the rates prescribed in it were arbitrary, unjust, unreasonable and unconscionable, because the service could not be furnished at the rates named therein without an actual loss to the defendant, thus practically working a deprivation of its property and property rights without just compensation or due process of law.

A preliminary injunction was granted restraining the defendant from removing the telephone and its appliances from the premises of plaintiffs, or discontinuing its telephone service. Other suits of a similar nature were commenced in the same court by different parties against the telephone company. An order of consolidation of all these suits was entered, but the subsequent proceedings were carried on in this suit, the testi-

mony introduced being also used in the others, and their disposition the same as that made of this. A large volume of testimony was taken, and the case was submitted on pleadings and proofs. On February 28, 1900, a decree was entered dissolving the preliminary injunction and dismissing the bill of complaint, with costs. Mr. Justice Barnard, before whom the case was heard, was of the opinion that the rates fixed by the act were unreasonably low for the service and supplies to which they refer, and that, therefore, the act could not be sustained. An appeal was taken to the Court of Appeals of the District, which on May 21, 1901, reversed the decree of the Supreme Court and remanded the case with instructions to enter a decree granting the permanent injunction, as prayed for, but with a single modification. From such decree the case was brought to this court on appeal.

*Mr. A. S. Worthington* and *Mr. John W. Griggs* for appellant.

*Mr. John J. Hemphill* and *Mr. Arthur A. Birney* for appellees.

MR. JUSTICE BREWER delivered the opinion of the court.

A preliminary question is whether the decision of the Court of Appeals is a final decree. We are of opinion that it is. After ordering a reversal of the decree of the Supreme Court, it adds: "And that this cause be, and the same is hereby, remanded to the said Supreme Court, for the entry of a decree granting the injunction in conformity with the opinion of this court." The closing sentence of the opinion is as follows: " For the reasons given the decree will be reversed, with costs, and the cause remanded for the entry of a decree granting the injunction in conformity with this opinion." Prior thereto it is stated :

" Congress could not, and did not, undertake to compel the defendant to remain in occupation of the field of operations and carry on business at the imposed rate against its will.

"If the defendant, convinced that the rate fixed by law is ruinously low, had suspended its business and abandoned all operations within the District, Congress would have no power over it other than to compel it to remove its obstructions from the streets and other public places. Nor would the courts, in such event, have any power to compel the defendant to give its services to any person. But the defendant cannot remain and carry on its former business in defiance of the law. Persisting in its business, it must be regarded by the courts as accepting the condition and coming under obligation to perform its services at the statutory rate. So persisting and at the same time refusing obedience, it is within the judicial power to compel defendant to observe the rate fixed by Congress until such time in the future as it may voluntarily withdraw from business or Congress may relieve.

" According to this view of the defendant's rights and obligations, the preliminary injunction was properly granted, and should have been perpetuated upon final hearing, with the limitation before suggested."

The preliminary injunction, thus referred to by the Court of Appeals, "*ordered,* that upon payment by the complainants to the defendant of the sum of twelve dollars and fifty cents as one quarter's rent for the use of the telephone described in their bill, the defendant, its officers, agents and employés, be, and they are hereby, during the pendency of this suit restrained and enjoined from removing or attempting to remove from the premises of the complainants described in the bill of complaint the telephone and its appliances by said defendant heretofore placed therein, and from refusing or neglecting to connect the same with other telephones upon being requested so to do, and from neglecting or refusing to furnish telephone exchange service to the complainants for the said telephone in the same manner as it has heretofore furnished such service."

It thus appears that the Court of Appeals made a complete disposition of the controversy ; that all that was left for the Supreme Court was the ministerial duty of entering a final injunction in the language of the preliminary order, with the proviso that it should operate until such time in the future as the de-

fendant should voluntarily withdraw from business in the District. . Clearly this was a final decree. *Commissioners &c.* v. *Lucas, Treasurer*, 93 U. S. 108 ; *Bostwick* v. *Brinkerhoff*, 106 U. S. 3, and cases cited in the opinion ; *Mower* v. *Fletcher*, 114 U. S. 127.

We pass, therefore, to a consideration of the merits. The legislation of Congress appears as a proviso in the District appropriation act, and is in the following words :

"*Provided*, That from and after the passage of this act it shall be unlawful for any person or any telephone company doing business in the District of Columbia to charge or receive more than fifty dollars per annum for the use of a telephone on a separate wire ; forty dollars for each telephone, there being not more than two on a wire ; thirty dollars for each telephone, there being not more than three on a wire, and twenty-five dollars for each telephone, there being four or more on the same wire." Act of June 30, 1898, c. 540, 30 Stat. 525, 538.

In its answer defendant pleaded that this legislation " has no application to any individual desiring telephone service, but applies only to such service as may be rendered for the public to the District of Columbia, for the service rendered to said District for fire alarm, police and other public purposes." This defence is undoubtedly based on the fact that the paragraph in which this proviso is found, entitled " telegraph and telephone service," consists solely of appropriations for salaries and supplies in connection with telegraph and telephone service. As the paragraph, therefore, deals solely with public expenditures, the contention is that the proviso is a qualification of such public expenditures. As said by Mr. Justice Story, in *Minis* v. *United States*, 15 Pet. 423, 445 :

" The office of a proviso, generally, is either to except something from the enacting clause, or to qualify or restrain its generalities, or to exclude some possible ground of misinterpretation of it, as extending to cases not intended by the legislature to be brought within its purview."

See also *Austin* v. *United States*, 155 U. S. 417, 431.

While this is the general effect of a proviso, yet in practice it is not always so limited. As said in *Georgia Banking Company* v. *Smith*, 128 U. S. 174, 181 :

"The general purpose of a proviso, as is well known, is to except the clause covered by it from the general provisions of a statute, or from some provisions of it, or to qualify the operation of the statute in some particular. But it is often used in other senses. It is a common practice in legislative proceedings, on the consideration of bills, for parties desirous of securing amendments to them, to precede their proposed amendments with the term ' provided,' so as to declare that, notwithstanding existing provisions, the one thus expressed is to prevail, thus having no greater signification than would be attached to the conjunction 'but' or 'and' in the same place, and simply serving to separate or distinguish the different paragraphs or sentences."

In view of the general language of this proviso, it is not strange that appellant has not pressed this defence upon our consideration, and we are informed by counsel for the appellee that it was not called to the attention of the lower courts. We notice it only as leading up to a matter which is now presented. It appears by a stipulation of counsel that on February 1, 1898, while the District of Columbia appropriation act was pending in the House of Representatives, it was amended by adding the proviso in question. The amendment was not reported from any committee. The bill passed the House, February 2, and was thereupon sent to the Senate. On March 2, 1898, the committee on appropriations of the Senate reported the bill back to the Senate, recommending that the proviso be stricken out. This recommendation was rejected by the Senate on March 8, and the bill on that day passed. On the 9th day of March, on account of differences in respect to other parts of the bill, it was sent to a committee of conference. Prior to the passage of the act no investigation or inquiry was made by or at the instance of either house of Congress for the purpose of determining what would be fair and reasonable rates for telephone services in the District of Columbia, except as follows: On February 14, 1898, twelve days after the bill had passed the House and been sent to the Senate, the House adopted a resolution empowering a committee, appointed to investigate gas service in the District of Columbia, to investigate charges

for telephone service. On March 9, the committee began this
investigation. On July 8 the committee reported the testimony
they had taken, and asked to be continued with full powers and
leave to sit in vacation, and report at the next session of Con-
gress. The same day the House adjourned *sine die* without
taking any action upon the recommendation of the committee.
On February 28, the Senate passed a resolution authorizing the
Committee on the District of Columbia to investigate charges
for telephone service, and on the 2d of March a further resolu-
tion for the payment of expert accountants and stenographers.
Immediately thereafter the committee, by a sub-committee,
prepared to enter upon an investigation, and requested an ex-
pert accountant to examine the books of the defendant. On
the 8th of March, after the Senate had rejected the amendment
offered by the committee to strike out the proviso, the commit-
tee was discharged from further consideration of the matter.
The act passed both houses and was approved June 30. Now
this quotation is made from the opinion in *Chicago &c. Rail-
way Company* v. *Minnesota*, 134 U. S. 418, 458:

" The question of the reasonableness of a rate of charge for
transportation by a railroad company, involving as it does the
element of reasonableness both as regards the company and as
regards the public, is eminently a question for judicial investi-
gation, requiring due process of law for its determination. If
the company is deprived of the power of charging reasonable
rates for the use of its property, and such deprivation takes
place in the absence of an investigation by judicial machinery,
it is deprived of the lawful use of its property, and thus, in
substance and effect, of the property itself, without due proc-
ess of law, and in violation of the Constitution of the United
States."

And upon it counsel for the company make these observa-
tions: " And if the legislature cannot authorize a commission to
fix rates without giving the corporations interested an oppor-
tunity to be heard, it is hard to see how the legislature itself can
do so, not only without giving an opportunity for a hearing,
but, as is admitted to be the fact in this case, without making
even any *ex parte* investigation."

But it is well settled that the courts always presume that the legislature acts advisedly and with full knowledge of the situation. Such knowledge can be acquired in other ways than by the formal investigation of a committee, and courts cannot inquire how the legislature obtained its knowledge. They must accept its action as that of a body having full power to act, and only acting when it has acquired sufficient information to justify its action. Of course, whether a particular act was passed by Congress does not at all depend upon facts like these. In *Field* v. *Clark*, 143 U. S. 649, 672, it was said:

" The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable."

But while the conclusiveness of the authentication of the due passage of this act is in no manner impaired by the facts disclosed, yet those facts may be considered in determining what is the meaning and scope of the act. In *Blake* v. *National Banks*, 23 Wall. 307, 319, where there was a question as to the meaning of a statute containing apparently contradictory provisions, it was said:

" Under these circumstances, we are compelled to ascertain the legislative intention by a recurrence to the mode in which the embarrassing words were introduced, as shown by the journals and records, and by giving such construction to the statute as we believe will carry out the intentions of Congress."

Again, in *Platt* v. *Union Pacific Railroad Company*, 99 U. S. 48, 64, this rule was laid down:

" But in endeavoring to ascertain what the Congress of 1862

intended, we must, as far as possible, place ourselves in the light that 'Congress enjoyed, look at things as they appeared to it, and discover its purpose from the language used in connection with the attending circumstances."

And again, in *Holy Trinity Church* v. *United States*, 143 U. S. 457, 464, reference was made to the reports of committees of each house with a view of ascertaining the purpose of Congress in the statute then in question.

So, while we may not infer from the mere fact, that the committees of investigation never completed their work, that Congress acted unadvisedly; yet as each body authorized a full investigation by a committee, and before a report was received from such committee, took the action which it did, it is fairly open for consideration whether the general language found in this proviso is not subject to some limitations or qualifications. In other words, did Congress intend to cover the whole field of telephone service, wherein it was then carrying on an appropriate but unfinished investigation, or was it content with making a limited provision for the present, leaving to future consideration the question of additional legislation? Defendant pleaded that the proviso applied simply to " services rendered for the public to the District of Columbia." But it is difficult to find this limitation suggested by either its terms or its place in the statute. The prohibition is upon any person or any telephone company doing business in the District, and against charging or receiving more than fifty dollars per annum for the use of a telephone on a separate wire, etc. The language is general and it is not easy to read in it a qualification or limitation upon the prior portion of the paragraph, to wit, that portion appropriating money for salaries and supplies, no part of such salaries and supplies going to the telephone company.

We pass then to inquire whether any other limitation or qualification of the prohibition found in this proviso may fairly be read in its language. And we start with the proposition that it cannot be presumed that a legislature intends any interference with purely private business. It cannot ordinarily prescribe what an individual or corporation, engaged in a purely private business, shall charge for services, and, there-

fore, although the language of a statute may be broad enough to include such private business, it will generally be excepted therefrom in order to remove all doubts of the validity of the legislation. It appears that some portion of the defendant's business is of a purely private nature, the receipts whereof are spoken of in its reports as private rentals, and as to such business Congress could not, if it would, prescribe what shall be charged therefor. In many buildings, both those belonging to the government or the District, and those belonging to private individuals, is what may be called a local telephone plant; that is, an arrangement of telephones by which parties in different rooms can communicate with each other; a system which is not connected with the general telephone exchange, and is no more public in its nature than the speaking tubes or call bells in a building. It is only for the personal use of parties in the building. By it those in the building cannot communicate with the general public, nor can such public reach parties in the building. It is simply a local convenience for the use solely of those who are in the building. Such combinations of telephone instruments in a single building, with no outside connections, are furnished by the defendant, and the rentals therefrom, as well as the expenses thereof, are entered in its books of account, and constitute a part of its business. The mere fact that such telephones are furnished by the company, which also does a public business, does not make them a part of such public business, or subject them to the regulation by Congress of its charges. A railroad company may, if authorized by its charter, carry on not simply its strictly railroad business, but also an establishment for the manufacture of cars and locomotives. The fact that it is engaged in these two different works would not in itself subject the manufacture of cars and locomotives to the supervision of the legislature, although such body would have the right to regulate the charges for railroad transportation. So, in an inquiry into the reasonableness of the charges imposed by Congress in this legislation, it is essential that the receipts and expenses from such private telephone systems be excluded from consideration. It may be that the trial court did not take these receipts and expenses

into consideration, but we refer to them because they are re-ferred to in the testimony of some of the witnesses, and unless guarded against might be taken into account in the further investigation of this case.

Again, while a legislature may prescribe regulations for the management of business of a public nature, even though carried on by private corporations with private capital and for private benefit, the language of such regulations will not be broadened by implication. In other words, there is no presumption of an intent to interfere with the management by a private corporation of its property any further than the public interests require, and so no interference will be adjudged beyond the clear letter of the statute. Here the prohibition is against charging or receiving " more than fifty dollars per annum for the use of a telephone on a separate wire." What kind of a telephone service is contemplated, and how much goes with the telephone? It appears from the testimony that there are two kinds of equipment, one more expensive and more reliable than the other; that some of the company's subscribers are using the cheaper and inferior equipment. Was the statutory limitation of $50 per annum intended as the limit for the superior or the inferior equipment? It also appears from the testimony that the defendant furnishes to some of its customers, besides the mere telephone, such additional equipment, as wall cabinet, desk, auxiliary bells, etc., for which separate charges are made. Doubtless these additional appliances facilitate and tend to make more convenient and easy the business of telephoning, but they are not included in the terms of the statute, and all that is required by its language is the furnishing of the telephone. What equipment and appliances are essential and what only matters of convenience may not be clearly shown by the evidence, but obviously there can be no difficulty in securing proof thereof. Suppose, for instance, a legislature should prescribe the rates for the carriage of passengers by a railroad. If the language was limited to the mere transportation of the passengers it would not be held to include accommodations in a sleeper, although such sleeper belonged to the company and was used on its trains. Of course, if the statute in terms pre-

scribed charges for transportation carried on in the manner that it had been carried on, it might include all the conveniences which had been theretofore furnished by the company, but when the statute simply prescribes a rate for transportation it will include only the ordinary and necessary facilities for such transportation, and not those conveniences which make travel more comfortable. So here, if this statute had in terms prescribed that the company should furnish the same conveniences and facilities for carrying on the telephone business that it had been wont to do in the past, it would be held to mean the equipment heretofore used and to include all these auxiliary matters, but when it is limited to the " use of a telephone " the courts cannot extend it beyond its terms and hold the statute to include things not named therein. The order which was directed by the Court of Appeals was one restraining and enjoining the defendant from removing from the premises of the complainant " the telephone and its appliances by said defendant heretofore placed therein, and from refusing or neglecting to connect the same with other telephones upon being requested so to do, and from neglecting or refusing to furnish telephone exchange service to the complainants for the said telephone in the same manner as it has heretofore furnished such service." In other words, the decree directed the defendant to furnish, for fifty dollars per annum, the equipment with all the facilities and appliances which it had theretofore furnished, including not merely the telephone on the separate wire, but the auxiliary matters heretofore referred to.

It may be that Congress, legislating simply for the use of the telephone, felt that the information it already possessed was sufficient to justify it in prescribing a reasonable charge therefor, at least for the inferior equipment, and did not wait for a full investigation in respect to the value of the use of the best equipment together with all these auxiliary matters. It may be that if all these matters are taken into account, and are within the purview of the statute the conclusion of the trial judge was right, that no reasonable remuneration was furnished by the rates prescribed, whereas it may be that, excluding them, it will be evident beyond question that the charges pre-

scribed are reasonable and just. At any rate, the decree as directed by the Court of Appeals was erroneous and cast a burden upon the defendant to which it was not subjected by the legislation of Congress.

Before closing the opinion, one thing must be referred to. The Court of Appeals, not entering into any full inquiry as to the reasonableness of the charges, held that Congress had a right to prescribe them, whether reasonable or unreasonable, and that, if in fact unreasonable and unremunerative, the only recourse of defendant was to retire from its business. This involves a question of constitutional law of great importance, upon which we at present express no opinion. The future investigation may relieve from any necessity of considering it. At any rate, it is well to have the facts settled before we attempt to determine the applicable law. And the facts should be settled by the trial court.

In *Chicago, Milwaukee &c. Railway* v. *Tompkins*, 176 U. S. 167, 179, a case involving the validity of railroad rates established by a commission in the State of South Dakota, and in which we found that there had been error in the methods pursued by the trial court for determining the question of reasonableness, we said:

"The question then arises what disposition of the case shall this court make. Ought we to examine the testimony, find the facts, and from those facts deduce the proper conclusion? It would doubtless be within the competency of this court on an appeal in equity to do this, but we are constrained to think that it would not (particularly in a case like the present) be the proper course to pursue. This is an appellate court, and parties have a right to a determination of the facts in the first instance by the trial court. Doubtless if such determination is challenged on appeal it becomes our duty to examine the testimony and see if it sustains the findings, but if the facts found are not challenged by either party then this court need not go beyond its ordinary appellate duty of considering whether such facts justified the decree. We think this is one of those cases in which it is especially important that there should be a full and clear finding of the facts by the trial court. The ques-

tions are difficult, the interests are vast, and therefore the aid of the trial court should be had."

In *Kansas* v. *Colorado*, 185 U. S. 125, the questions before us arose on demurrer to the bill. We declined to enter into any determination of the law based upon the allegations of the bill, but overruled the demurrer and required the parties to introduce the testimony in order that the real facts might be presented before any determination was had in respect to the law, saying at the close of the opinion : " The result is that in view of the intricate questions arising on the record, we are constrained to forbear proceeding until all the facts are before us on the evidence." It may be that in this case further evidence may be needed, and, if so, the trial court may provide therefor.

> *The decree of the Court of Appeals is reversed, and the case remanded to that court with directions to remand the cause to the Supreme Court of the District of Columbia with instructions to that court to set aside its decree and inquire as to the reasonableness of the rates in the light of the construction we have given to the statute.*
>
> *Reversed.*

MR. JUSTICE GRAY and MR. JUSTICE BROWN did not hear the argument and took no part in the decision of this case.

MR. JUSTICE WHITE dissenting.

My dissent is constrained, not alone because of an inability to concur in the reasoning contained in the opinion of the court and the decree based on it, but also because the court has not decided a question which is necessarily involved in the cause, and which it is essential, in my opinion, to dispose of now in order that justice may be adequately administered. The case is this : The act of Congress of 1898 fixed the rate to be charged for telephone service in the District of Columbia. The plaintiff in error, by whom alone the business of affording telephone facilities was carried on in the District of Columbia, refused to comply with the act of Congress. In other words, the corporation,

though it continued to use the public streets and places, without the use of which it could not carry on its business, asserted its right to disregard the act of Congress and to exact from the public rates largely in excess of the limit fixed by Congress. This the corporation claimed the right to do under the assumption that the rates fixed by Congress, if enforced, would prevent it from reaping adequate remuneration, and hence the result would be the confiscation of its right to use its plant, thereby giving rise to the taking of its property without due process of law. Concerning this proposition, in the trial court, voluminous testimony was introduced, and after an elaborate hearing the court held that the enforcement of the rates fixed by the act of Congress would deprive the company of the right to remuneratively use its plant, and therefore the act of Congress was repugnant to the Constitution. The Court of Appeals of the District reversed the trial court, and held that it was the duty of the corporation, if it continued in business, to conform to the rates fixed by Congress. In reaching this conclusion the court did not pass on what would be the effect of the rates fixed by Congress if they were put in force, because the court concluded even although the rates established by the act of Congress would prevent the corporation from reaping adequate reward for the use of its plant, nevertheless the corporation was under the obligation, if it continued its business, to comply with the act of Congress. In effect, the court held although the corporation was not bound to continue in the business of furnishing telephone facilities, yet if it elected to do so, and therefore used the public ways and streets, the corporation could not lawfully set at defiance the act of Congress. And, reaching this conclusion, as previously stated, the court found it unnecessary to determine what would be the operation of the rates fixed by Congress, and abstained from so doing. The duty which the court thus held rested upon the company, was deduced, not from general considerations, but from the particular relation of the company to the District of Columbia and the express conditions imposed by Congress in granting to the corporation the use of the streets or in legalizing such use.

The finding of the court on this subject was stated in its opin-

ion as follows, and the accuracy of this statement was not controverted in the argument at bar. The court said:

"Congress has passed no act incorporating the defendant, or giving it license to carry on its business in the District of Columbia.

"The only recognition that it claims is to be found in certain items and clauses of appropriation bills, beginning with that of July, 1888. In that act it was provided, after an appropriation for telephone service, that the Commissioners of the District might authorize the wires of any 'existing telegraph, telephone or electric light company now operating in the District of Columbia,' to be laid under the streets, alleys, etc., 'whenever in their judgment the public interest may require the exercise of such authority—such privileges as may be granted hereunder to be revocable *at the will of Congress without compensation.*' 25 Stat. 323, 324.

"An item continuing this authority for another term of Congress under the same condition was contained in the act of March 2, 1889. 25 Stat. 804.

"The act of August 7, 1894, authorized the erection and use of telephone poles in the public alleys, but the privilege was made subject to revocation at the will of Congress without compensation. 28 Stat. 256.

"The act of March 3, 1897, provided that hereafter no wire shall be strung on any alley pole at a height of less than fifty feet from the ground at the point of attachment to said pole; and it was declared that nothing herein contained shall authorize the erection of any additional pole upon any street, avenue or reservation.

"The usual condition of revocation *at will without compensation* was again added. 29 Stat. 678."

Now this court in reversing the decree of the Court of Appeals and remanding the case for a new trial does not consider or decide the only question upon which the Court of Appeals rested its decree, but on the contrary that question is passed by upon the theory that it can be more appropriately decided after a further investigation of the facts to be had on the new trial which the court orders. The action of the court is sustained in

its opinion upon several propositions.   Let me briefly consider them.

1. As it is shown there are various kinds of telephone service, some more complete and more expensive than others, and as the act of Congress does not contain a classification and a fixing of rates embracing all classes of such service, therefore it is decided that the case is not in a condition to be now disposed of finally, but must be remanded for a new trial in order that further testimony on this subject may be taken.   But this involves a *non sequitur*.   Conceding in the fullest degree that there are various kinds of telephone service, some more costly than others, and that the classification of the act of Congress does not embrace all kinds of such service, it is submitted that it should be now decided that the act of Congress applies to that which is customary and reasonable, and as to such customary and reasonable service compliance by the corporation with the act of Congress should be commanded.   If it be that the decree below went further than this—which in my opinion it did not—then the decree should not be reversed, but should be modified so as to cause it to conform to the act of Congress, and as thus modified it should be affirmed.

2. As the court finds that there are certain classes of telephones furnished by the company which are for private use and the charge for which Congress has no power to regulate, and as the court considers the proof as to the revenue derived from this character of telephone is not clear, therefore it is held the case must be remanded to take testimony on this subject.   But the testimony in the record on the subject of these private telephones is as full as it can be made on the new trial. The number of such telephones is shown, the revenue received from them is established and the influence to be produced upon the result of the rates fixed by Congress by the elimination of charges for such telephones is as clear on this record as it can be made in any record which may hereafter come before us for consideration.   It follows then even under the assumption that the limitation upon the power of Congress as to such telephones be well taken, in my opinion no adequate reason is thereby afforded for not deciding the controversy now presented by the

record. This is said, of course, under the assumption, *arguendo* only, that the rule as to private telephones announced by the court is correct.

But putting out of view all these considerations and conceding that what has been previously said is erroneous, in my judgment the case ought not to be reversed and remanded without deciding the fundamental question which the cause presents which was decided by the Court of Appeals, and which, if the view taken by that court be sound, is controlling. Now that question lies at the very threshold of the case. It is wholly independent of and cannot, in the slightest degree, be influenced by any further investigation of fact which may be made on the new trial which is now ordered. I do not know how to more aptly illustrate the duty which exists to decide this question than by taking into view the situation as disclosed by this record. Certainly since the act of Congress was passed in 1898 the corporation has, in defiance of that act, continued to use for its benefit the public streets and property, and has in doing so imposed upon the public burdens which the corporation had no right to exact if the act of Congress was lawful. Beyond all question, this condition of things must now continue for a long period of time during the progress of the new trial which the court now orders. Let me suppose that, after the new trial, when the record again comes here, the rates as fixed by Congress will be found to be so low that they will compel the corporation to abandon the use of the public ways, and hence go out of business. What will be the duty of the court then? Will it not be compelled to decide the question which is now left undecided? Let me further assume that then the opinion of this court will be in accord with that expressed on the case now here by the Court of Appeals. Will it not necessarily follow that the corporation will be held during all the intervening time to have wrongfully violated the act of Congress and to have unlawfully imposed upon the public? · And yet all this wrong and all this abuse which must arise under the hypothesis which has been stated can be absolutely prevented if the court now decides the question it will necessarily be called upon to decide hereafter. To me it seems clear that it is no

answer to this proposition to say that it may be, when the case hereafter is presented for decision, the court may conclude that the principle upheld by the Court of Appeals was erroneous. Concede this, and yet the duty of now deciding the question appears to me to be equally manifest. I submit whatever may be the conclusion as to the correctness of the principle announced by the Court of Appeals, that principle can never be overthrown upon the theory that there was no power in Congress to deprive the corporation of the use of the public streets and property without compensation, since in unequivocal and express terms the various permissions granted by Congress to the corporation to use the public streets provide in language, leaving no room for construction, that the power was reserved to Congress to revoke at its will and pleasure the right of the corporation to use the streets. It necessarily follows that the view announced by the Court of Appeals can in any event be disregarded only upon the theory that whilst power is in Congress to take away the right of the corporation to use the streets without giving it compensation, that an act fixing rates is not the exercise by Congress of such power. But if such be the correct view, then that interpretation, in the interest of a sound administration of the law and for the protection of the public, should be now declared. The reason for this is apparent, because, if such a principle were now announced, admonished by the opinion of this court, Congress will more advisedly be able to exert such further action as will prevent the corporation from using the public property in disregard of law, and save the public from extortion if it results from charging higher rates than those fixed by the law now under consideration.

Whilst I am not authorized to say that Mr. Justice HARLAN and Mr. Justice McKENNA concur in the reasons which I have just given for my dissent, they request me to state that they also dissent from the opinion and decree of the court.