Differing, as I do, from the reasoning and conclusions of the majority opinion I feel constrained, in view of the importance of the legal questions involved, to express, at some length, the grounds of my dissent from the majority opinion. In so doing I have followed, in the main, the reasoning and at times the verbiage of the original opinion filed in this case by our learned Commissioner, HIGBEE, then one of the judges of this court, in which the judgment of the circuit court was affirmed, but which opinion was not adopted, and the case was thereupon reassigned. I concurred in that affirmance and a more deliberate consideration of the facts and the law has not caused me to change my mind.
I. The Union Electric Light Power Company entered into contracts with the several respondents owning isolated buildings, to heat and light those buildings for a period ofVoluntary years for certain fixed prices. In the contract withContracts. the Hotels Statler Company, the price fixed for heating and lighting the building, in round numbers, was $25,000 per annum. The rates fixed by the Commission increased this sum to over $82,000. There were corresponding increases in the other cases. The increase in revenues resulting from the order of the Commission in the heating and lighting cases is estimated at $910,387 per annum.
It is claimed by the appellants that in the electric department the company was about "breaking even," but the steam heating department, it is claimed, was carried on at a tremendous deficit without any provision for depreciation.
The contract with the Ely Walker Dry Goods Company recites that "the steam to be supplied under this contract shall be furnished by the company as a by-product of the electricity to be generated." Mr. Pierce, who negotiated the contract for the Pierce Building, testified: "The heating was a very inconsiderable part of the contract." The bond circular, on the faith of *Page 349 
which the company invited the public to purchase its bonds, shows that the earnings of the company for the year 1917 were $6,046,549; its operating expenses, including taxes and depreciation reserve, were $4,393,249, leaving net earnings, $1,652,600. Its net earnings for the first eight months of 1918 exceeded those for the first eight months of the year 1917. The bond circular issued by the appellant, the Electric Light Company, shows a steady, healthy improvement in the company's financial affairs. In the consideration of the questions arising in this case, this statement should have the force and effect of a judicial admission. [Steele v. Railroad, 265 Mo. 97, 116, et seq.]
In re Public Service Co. of Northern Illinois, P.U.R. 1920 C, 17, l.c. 24, quoting from New Jersey P.U. Commissioners, P.U.R. 1918 E, 910, 915, it is said:
"An emergency for which a carrier is entitled to relief by a temporary emergency rate exists where, by reason of general conditions not affecting the applicant utility alone, the operating revenues are insufficient to operate and maintain its property and to pay rentals and interest on such of its securities, a default in the payment of which would jeopardize the solvency of the company."
The company's bond circular statutes: "Net earnings over one and one-half times all interest charges. Net earnings after bond interest equal to eleven times interest requirements."
We are of the opinion that the evidence demonstrates that no emergency existed justifying the Commission in abrogating the contracts entered into by the company with the relators, notwithstanding the fact that by Section 10535, Revised Statutes 1919, the burden of proof in these proceedings is on relators.
The right of private contract is safeguarded by the State and Federal constitutions. There is no question here of the State confiscating the company's property. The State, under its police power, may not increase the rates fixed by the contracts in order that the company *Page 350 
may have a reasonable income from its investment and pay dividends to its stockholders. It can only do that, if it can in any case relieve against a contract, when it is clearly shown that the public welfare demands it in the specific case.
The company asked the Commission to increase its rates "to meet the increased cost of fuel, taxes and wages." The purpose is clearly avowed. It would have the Commission rewrite the contracts with its patrons so as to shift the increase in the burdens it has agreed to carry to the shoulders of the other parties to the contracts, and thus enable the company to earn its former profits. That, as disclosed by the record, was the object to be attained.
There was no finding, nor was there any evidence to justify a finding, that the company could not continue to perform its functions. The burden was on the company to prove that an emergency existed justifying an increase in the rates the parties had contracted should be paid. On the contrary, the evidence demonstrates that there was no emergency. In Louisiana v. Louisiana Water Co., P.U.R. 1918 B, 774, l.c. 778, our Commission said:
"While, as above stated, we hold the Commission possessed the requisite power, yet it is undoubtedly true that increasing the rates above the price at which a company solemnly agreed to furnish its commodity, and in return for which it received a permit to use the streets and a practical monopoly of the business, should not be done lightly or unless the public interest is threatened in some way if the existing rates are allowed to continue. It is entirely from this standpoint of the public interest that state regulation of public utilities has been attempted."
In Southern Iowa Electric Co. v. City of Chariton, 41 Sup. Ct. Rep. 400, decided April 11, 1921, the late Chief Justice WHITE, delivering the opinion of the court, said:
"Two propositions are indisputable: (a) that although the governmental agencies having authority to *Page 351 
deal with the subject may fix and enforce reasonable rates to be paid public utility corporations for the services by them rendered, that power does not include the right to fix rates which are so low as to be confiscatory of the property of such corporations" (citing cases); "and (b) that where, however, the public service corporations and the governmental agencies dealing with them have power to contract as to rates, and exert that power by fixing by contract rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and therefore the question of whether such rates are confiscatory becomes immaterial" (citing cases).
The respondents contend that the order of the Commission is in violation of the terms of their contracts and a confiscation of their property without compensation in contravention of the guaranties of the Federal Constitution. The agreed facts bring these cases within the second proposition stated by the learned Chief Justice. It is controlling.
The company and the respondents voluntarily entered into contracts fixing the rates to be paid by the latter for services to be rendered at certain stipulated prices. Confiscation implies the taking of property against one's will without just compensation. Insistence upon the performance of a lawful contract voluntarily entered into cannot be viewed as confiscation. This case differs from State ex rel. v. Pub. Serv. Comm., 275 Mo. 201. In that case the State, representing the municipality, consented to change the stipulated rates. In Pawhuska v. Pawhuska Oil Co., 250 U.S. 394, Mr. Justice VAN DEVENTER quoted from New Orleans v. N.O. Water Works Co.,142 U.S. 79, as follows:
"In this case the city has no more right to claim immunity for its contract with the Water Works Company, than it would have had if such contract had been made directly with the State. The State, having authorized such contract, might revoke or modify it at its pleasure." *Page 352 
II. It is well settled that the abrogation of the terms of a private contract under the police power of the State is the exercise of a grave and dangerous power, and should bePublic asserted only with the greatest caution and by means ofWelfare. every instrumentality at the command of the Commission to determine with reasonable certainty that the rate fixed in the contract injuriously affects the public welfare. It must determine that the contract between persons engaged in the particular business and well advised as to its probable effects, not only at the time, but in the light of future conditions, is so unreasonable as to be detrimental to the public interest. [O. C. Smelt. R. Co. v. Public U. Comm., 187 Pac. (Colo.) 1082, 1086.]
The State has furnished the Commission with expert appraisers, but the company's properties were not appraised by them. The company has for many years paid dividends on a large amount of common and preferred stock. The company claims that it is compelled to pay increased taxes over and above the taxes upon which its rate schedules are based. It is fairly inferable that it has deducted its Federal and State income taxes from its gross income, estimated by the company to be $103,950 for the years 1917 and 1918. Stockholders are entitled to deduct from their personal income tax returns the income paid by the corporation from which they drew dividends. If the corporation pays the tax as an operating expense and the stockholder deducts the tax from his return, as he has a right to do, then the patrons of the corporation pay the tax in increased rates. The stockholder should pay this burden. He is not entitled to more favorable consideration at the hands of the State than any other taxpayer. [Re Indianapolis Water Co., P.U.R. 1919 A, l.c. 478; In re Quincy R. Co., P.U.R. 1919 E, l.c. 401.]
III. It is contended by respondents that the company, in furnishing steam heat, was performing a private and not a public service and therefore the Commission *Page 353 
had no jurisdiction to put into effect any schedule of rates for such service.
There is nothing to prevent a public utility from engaging in a private enterprise. The fact that a public utility may be performing a public service in one department, isPrivate entirely consistent with its rendering private serviceService. in another. This is illustrated in the case of the Terminal Taxicab Co. v. Pub. Utilities Commission,241 U.S. 252. The taxicab company was authorized to operate automobiles and other vehicles and carry passengers. It operated taxicabs to and from railroad stations and to and from a certain hotel. This the court held to be a public service. It also furnished automobiles from its garage. It did not respond to all calls for this class of service. It chose its customers just as the company, through its manager, selected one building here and another there. The Commission ordered it to furnish certain information, including a statement concerning the operation of its garage. The company resisted this, contending that in operating its garage it was performing a private service; in other words, it did not profess to carry the public generally, hence the Commission had no jurisdiction to require such information. The Supreme Court upheld this contention. In the Terminal Taxicab case the court said, l.c. 254, "The important thing is what it does, not what its charter says."
The company did not profess to do a general heating business. It had no franchise to lay its pipes across the streets and alleys of the city, nor to condemn right of way across private property. It is true that it had permits from the city where its pipes were laid, but it stipulated in its contracts that such permits might be revoked. It had no schedule of rates for steam heating. The testimony of its assistant manager that he picked one building here and picked another building there, confirms the testimony of Mr. Sanderson, the electrical advisory engineer, that the company refused to heat the buildings referred to in his testimony. There was testimony *Page 354 
that, in some instances at least, the company undertook to heat a building, not as a money-making proposition, but to advertise its business. The Commission, in effect, found that the company had no schedule of rates for heating; that the suspicion of separate bargaining and of discrimination in fact was not removed and that the "effect of the schedule is to create as many classes of consumers as there are consumers." It is evident that the company, in furnishing heat to its selected customers, was not performing the functions of a public utility and that it was beyond the power of the Commission to exercise its regulatory power, impairing the obligation of the contracts with relators.
In Roach v. Danciger, 4 Mo. P.S.C. 650, the Commission said:
"The fact that defendant did not use the streets and public places of the city, so strongly urged by defendant as a reason why the business is private and not public in character, we consider of little importance. The securing of a public franchise is not determinative of whether the business is impressed with the public use."
That case came before this court for review. [See State ex rel. Danciger v. Pub. Serv. Comm., 275 Mo. 283.] At page 494, FARIS, J., said:
"There is in this case no explicit professing of public service, or undertaking to furnish lights or power to the whole public, or even to all persons in that restricted portion thereof who reside within three blocks of the company's plant. For there is in the case neither existence nor assertion of the right of eminent domain. Nor does there exist any franchise or license, nor has there been obtained from the town of Weston any right or privilege to cross the streets, alleys, or other public places therein, nor are there any charter powers authorizing the company, or the respondent, to engage in the public service. The fact of professing public service, that is, of holding himself or the company out as ready and willing to serve the public, must therefore, in *Page 355 
order to hold the respondent, be deduced implicitly, if it is to be found in this record at all."
Again, at the foot of page 495: "In the light of these considerations does the business of respondent constitute him a public utility, within the meaning of the Public Service Commission Act? We are of the opinion that it does not. For as forecast above, State regulation of private property can be had only pursuant to the police power, which power is bottomed on and wholly dependent upon the devotion of private property to a public use. If the requirement that the private property shall be devoted to a public use, before it can be regulated, and before inquisitorial authority can be exercised over it, is not to be read into the applicatory law, then that law is obviously unconstitutional, because it takes private property for public use without compensation."
And again, at the foot of page 500: "The rule by which a profession of public employment is to be tested, where, as here, such profession arises, if at all, implicitly, is thus laid down in a recognized work on Public Service Corporations: `The fundamental characteristic of a public calling is indiscriminate dealing with the general public. As Baron ALDERSON said in the leading case: "Everybody who undertakes to carry for anyone who asks him is a common carrier. The criterion is whether he carries for particular persons only, or whether he carries for everyone. If a man holds himself out to do it for everyone who asks him, he is a common carrier; but if he does not do it for everyone, but carries for you and me only, that is a matter of special contract." This regular course of public service without respect of persons makes out a plain case of public profession by reason of the inevitable inference which the general public will put upon it. "One transporting goods from place to place for hire, for such as see fit to employ him, whether usually or occasionally, whether as a principal or an incidental occupation, is a common carrier."' [Wyman on Pub. Service Corps., 227.] *Page 356 
"Testing the facts of the instant case by this rule, and by the rule announced by the majority of the courts, as well as by the reason of the thing, and the far-reaching results of any other view, rather than by the view taken by a majority of the public service commissions of the several states, we are constrained to hold that as to complainant, the respondent owed him no continuing public duty of service, and that the view taken nisi
is correct.
"It follows that the case ought to be affirmed. Let this be done. All concur."
In State ex rel. v. Eastin, 270 Mo. 193, l.c. 206, the court in banc said: "In all such cases the franchise contracts which were so abrogated were made with the governing authorities of the annexed or absorbed municipality. . . . But nevertheless by statute or Constitution these contracts were made subject to the power or rate regulation by the authorities which granted them to the public service company affected. . . . The situation as presented by them does not turn, as in the instant case, upon a private contract running for a limited and reasonable term made with a private consumer for a valuable consideration, which consumer, by the terms of his contract, had not reserved to himself within the contract period any right of regulation, and who had behind him no statute retaining for him any power of rate regulation."
See also Public Utilities Comm. v. Telephone Association,270 Ill. 183, 110 N.E. 334; Cawker v. Railroad Comm., 147 Wis. 320, 123 N.W. 157; Nowata Co. Gas Co. v. Henry Oil Co., 269 F. 742; Chesapeake Potomac Tel. Co. v. Manning, 186 U.S. 238, 247.
IV. It is insisted by relators that the Commission put into effect schedules which were discriminatory, in violation of Section 10477, Revised Statutes 1919, which reads: "No . . . electrical corporation shall make or grant any undue or unreasonable preference or advantage to any person, corporation . . . or subject *Page 357 
any particular person or corporation to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."
The order applies to consumers of electric energy in the city of St. Louis using in excess of 1000 kilowatt hours per month, except customers using service supplied under existing contracts for water-power service and under contract with municipalities.
The testimony was that the company divided its customers off into four different classes.
(1) Domestic consumers who out of a total gross revenue of $5,684,087 for the year 1917, produced for the year $2,788,827.
(2) Consumers using 1000 kilowatt hours per month affected by the income. These consumers produced a gross revenue to the company of $2,390,000.
(3) Municipalities.
(4) Users of Keokuk generated power.
(The latter two produced revenue together of $505,260).
Mr. Boehm, the company's auditor, testified at the hearing:
"The revenue from customers who are using less than 1000 kilowatt hours per month, was $2,788,827; total revenue was $5,684,087. Customers using in excess of 10000 kilowatt hours per month not included in the proposed change of rates are municipal light and power customers.
"Q. What is the reason for excluding them, although their quantity is in excess of 1000? A. It would not be fair to charge water-power customers on a coal basis, and the municipal contracts are excluded as the contract, I believe, runs to 1921.
"Q. What do you mean by water power? You mean energy from the Hydro-Electric Company? A. Yes; these customers purchase that energy as unrefined. I don't know the particular reasons for excluding municipal light and power corporations.
"Q. Your schedule as filed doesn't intend to apply to the municipal? A. No; it is a matter of ordinance. *Page 358 
It would probably require the passage of an ordinance to get anything whatever from them."
The city had contracts running until 1921; the relators had contracts running beyond that period. The company would make fish of one and fowl of the other.
The municipality, in contracting for electric service, was acting as any other corporation in a business transaction. In exempting it as well as domestic consumers, the schedule is clearly discriminative. [Re Milwaukee E.L. P. Co., P.U.R. 1919 A, 136, 139; Re Hagar, P.U.R. 1918 E, 451, 456.]
V. Appellants contend that the order made by the Commission "does not attempt to adjudicate any rights which relators may have to dispute the rates fixed by the order if in conflict with their contracts; that if sued by the company for the increased rates, they can plead their contracts and defend at law, or they may pay under protest," etc. Ordinarily if a court has no jurisdiction in the premises, its judgment is a nullity and subject to collateral attack.
The orders of the Commission are merely legislative acts. Section 10522, Revised Statutes 1919, provides for a review on a writ of certiorari of the reasonableness or lawfulness of any order or decision of the Commission. Section 10526 provides that in all collateral actions or proceedings the orders and decisions of the Commission which have become final shall be conclusive. This question was ruled against appellants' contention in City Water Co. v. Sedalia, in an opinion in Division Two of this court, handed down on May 25, 1921.
In view of all of which I respectfully dissent from the reasoning and conclusion of the majority opinion and hold that the judgment of the circuit court in each of these cases should be affirmed. *Page 359