### Petition of SOUTHERN BELL TEL. & TEL. CO.
No. 6403-TP.

Railroad & Public Utilities Commission.
November 29, 1961.

Nathan H. Wilson and Harold B. Wahl of Loftin & Wahl, all of Jacksonville, for petitioner.

Philip S. Brewer, Hyman Lieberman and Robert L. Shevin, all of Miami, for protestants.

Lewis W. Petteway and James L. Graham, both of Tallahassee, for the commission and the public generally.

Chairman WILBUR C. KING, Commissioners JERRY W. CARTER and EDWIN L. MASON, each participated in the hearings and disposition of this cause.

BY THE COMMISSION.

Southern Bell Telephone & Telegraph Co., a public utility engaged in, among other things, furnishing local exchange telephone service within the state of Florida, has filed with this commission its petition seeking authority to revise its statewide groupings of exchange rate schedules. Also, the telephone company requests this commission to provide a method whereby future inequities resulting from exchanges growing out of their respective rate groups may be automatically corrected and adjusted in accordance with rules and regulations of the commission.

The commission held two public hearings in the city of Jacksonville on the petition, pursuant to formal notice giving the time, place, and purpose of said hearings. The notice of said

hearings was given the most comprehensive distribution of any case ever handled by this commission. It was served by United States mail on the mayor of each city and town served by Southern Bell; the chairman of the board of county commissioners in each county; each labor organization within the telephone company's service area; every chamber of commerce in the territory served by said utility; every member of the Senate and the House of Representatives of the Florida legislature representing any part of the territory served by said telephone company; and upon several hundred individuals who, at one time or another, have requested notice of such hearings.

In addition to the broad distribution just described the commission, by formal order, directed Southern Bell to publish notice of said hearings, together with present and proposed rates, in at least one newspaper in each county in which the telephone company operates a telephone exchange. Every medium of mass communication, newspapers, radio, and television, participated in giving the public detailed and comprehensive information concerning the petition and its proposed revision in exchange groupings and rates. In spite of the wide publicity given these hearings, there was virtually no objection raised at the hearings concerning the telephone company's proposal.

Such protest as was advanced was of a most nebulous character and appeared to be directed primarily at the telephone company's yellow page directory advertising policies and practices. The commission disallowed these protests on the basis of court decisions holding that yellow page advertising is not a public utility function of the telephone company, and therefore, is not subject to control and supervision by a commission such as this.[1]

---

1. Editor's note. Counsel advises that the commission, in arriving at its conclusion, relied upon an unreported Dade County circuit court decision and the authorities cited therein. The opinion of Circuit Judge STANLEY MILLEDGE in State, ex rel. Montemarano v. Southern Bell Tel. & Tel. Co., file no. 23658, October 9, 1950, follows —

By an order entered October 5, 1950, the respondent's motion to quash the alternative writ was granted. This action was impelled by the court's view that the relief sought by the relator, if granted, would extend public regulation into a field of respondent's activities which are not the proper subject of such regulation, viz., its classified advertising directory.

The court concurs in the view of Judge Pecora in Abco Moving & Storage Corporation v. New York Telephone Co., 83 N.Y.S. 2d 448, wherein he expressed the opinion that a telephone company in publishing a classified directory does not perform an essential public service —

Southern Bell's present schedule of exchange groups became effective on February 1, 1952 and was based on telephone development as of March 31, 1951. In this proceeding, it has taken the position that the unusually large growth in number of telephones within certain service areas during the past decade has rendered the old schedule inappropriate for present day use. The record discloses that, since the adoption of the present groupings, the number of telephones served by Southern Bell in Florida has increased approximately 190% while some of the individual exchanges served by said utility have increased by as much as 1500%. The phenominal growth of some exchanges has resulted in telephone subscribers in exchanges of comparable size, in many instances, paying different local exchange rates. Extensive expansion of local calling areas throughout the state, and the establishment of many new exchanges, have also resulted

---

that as to the advertisements therein, the position of the telephone company is analogous to that of the publisher of a newspaper or magazine. In this connection, see also: Seaport Agencies v. British Columbia Telephone Co., 192E PUR 271; Commission v. Northwestern Bell Co., 1922D PUR 769; Fondulac, etc. v. Wisconsin Telephone Co., 4 Wis. RCR 340; Benyon v. Lincoln T. & T. Co., 1933A PUR 334.

In my view, while in the conduct of its principal function, viz., the transmission of communications by wire, the respondent telephone company enjoys a practical monopoly and in that phase of its operations is clearly subject to public regulation; nevertheless, the phase of its business represented by the classified advertising section of, or appendix to, its alphabetical directory is not a monopoly.

There are numerous media through which persons desiring to do so may advertise. Respondent's classified directory is merely one of several which are available. While many persons may, and do, conclude that such form of advertising is desirable and valuable, still there are readily available to them for similar purposes the newspapers, magazines and other publications, radio, television, personal solicitation by mail, etc., which methods of advertising are commonly employed. Any obligation which the respondent may owe to any person with respect to classified directory advertising is necessarily the subject of private contract and not of public regulation.

Because the respondent has chosen to increase its revenue by the sideline of offering advertising space in a special section of, or appendix to, its alphabetical directory, it does not follow as a matter of law that such sideline activity becomes a part of its public service and subject to the same, or for that matter, any public regulation. Cf., City of St. Paul v. Tri-State, 258 N.W. 822; D. L. & W. R. Co. v. Town of Morristown, 276 U.S. 182, 72 L. ed. 523; C. & J. Telephone Co. v. Manning, 186 U.S. 238, 46 L. ed. 1144.

Upon these considerations it is patent that there is no showing of the clear legal right which is essential in mandamus proceedings. It is ordered that this memorandum opinion shall be filed as a part of the record in this cause.

in different local exchange rates for exchanges of comparable size. The primary purpose of this proceeding is to place each exchange in its proper rate group, thus bringing all of Southern Bell's exchanges in Florida into proper relation with each other and eliminating existing inequities in the application of exchange rates.

Another important purpose of this proceeding is to obtain commission approval of some method whereby future inequities resulting from exchanges growing out of their respective rate groups may be corrected and automatically adjusted in accordance with commission prescribed rules and regulations. Florida's anticipated growth during the next ten years gives substance to this portion of the proceeding and alerts the commission to the need for devising some procedure whereby telephone subscribers in the various exchanges of a telephone company will be assured of continuous equality between their own rates and those paid by subscribers in other exchanges of comparable size.

While the primary purpose of this proceeding is to revise exchange groupings so as to eliminate existing inequities, it is also important to note that the proposed revision of exchange groupings will result, if approved, in an increase of approximately $2,192,500 in the telephone company's gross annual revenue, or $1,015,996 increase in its Net Operating Income. This feature of the proceeding makes it necessary for us to look at the company's present earnings, and projected earnings, to be certain that the proposed revision, if approved, will not result in excessive earnings for the utility.

The telephone company's local exchanges presently are comprehended in 8 different exchange groups which are based on total telephones, main stations, and extensions. The proposed revision contemplates 13 different groups based on main stations only. The two schedules are as follows —

| Present (Stations) | Group | | | Proposed (Stations) |
|---|---|---|---|---|
| 0 - 350 | 1 | (UPPER | LIMIT) | 500 |
| 351 - 1,400 | 2 | " | " | 1,000 |
| 1,401 - 11,000 | 3 | " | " | 2,500 |
| 11,001 - 20,000 | 4 | " | " | 5,000 |
| 20,001 - 50,000 | 5 | " | " | 15,000 |
| 50,001 - 100,000 | 6 | " | " | 25,000 |
| OVER - 100,000 | 7 | " | " | 35,000 |
| | 8 | " | " | 50,000 |
| | 9 | " | " | 65,000 |
| | 10 | " | " | 100,000 |
| | 11 | " | " | 200,000 |
| | 12 | " | " | 400,000 |
| | 13 | " | " | 600,000 |

Under the proposed revision, some exchanges will receive a small increase in telephone rates; some will receive a decrease, and some will have no change in their existing rates. For example, under the proposal, there would be no change in 6 exchanges for 4-party residential service, 17 exchanges for 2-party residential service, and 14 exchanges for residential individual-line service. With further reference to residential service, there would be reductions in 32 exchanges for 4-party service, 58 exchanges for 2-party service, and 44 exchanges for individual-line service. There would be increases of a small amount in 53 exchanges for 4-party service, 20 exchanges for 2-party service, and 36 exchanges for individual-line service. For commercial service, there would be increases in more exchanges than there would be reductions, or no changes. In only two exchanges, Hollywood and Ft. Lauderdale, have increases in excess of forty cents per month been proposed. Those two exchanges enjoy extended area calling privileges and have grown from group 6 to proposed group 11. In 1951, those two exchanges had in excess of 20,001, but less than 50,000 telephones; whereas, at the present time, they have in excess of 100,000, but less than 200,000 telephones.

The specific rates proposed by the telephone company were published by the company at the direction of the commission for each exchange served by it within the state. For that reason, and for the further reason that there will be some changes in the final effective rates, there is no point in setting forth the various rates proposed for the different classes of service at the exchanges affected.

Before concluding this order, some reference should be made to the company's earnings and the impact the proposed regrouping will have on such earnings. The company's exhibit no. 10 shows its rate of return to be, on a going basis, 6.14%. After giving effect to certain wage increases which became effective September 1, 1961, this return was reduced to 6.03%. Assuming that the company's present proposed regrouping should be approved, with the incidental revision of exchange rates, the going rate of return would become 6.29%. However, we were not in accord with the method employed by the company in arriving at the various rates of return just cited. Accordingly, the company was directed to furnish as late filed exhibits calculations showing the rate of return when computed on the same basis customarily employed by the commission and its staff in testing the earnings of telephone companies. This was done and the late filed exhibit showed the rate of return to be 6.54%. However, there still existed some disagreement over the method employed. For example, in developing the allowance for Working Capital, the company arrived at a negative amount for the

cash portion of the allowance after giving consideration to the income tax payment lag, and then disregarded it in the final determination of the rate base. Under our method, the gross allowance for Working Capital is included in the rate base and then the deduction is made to compensate for the income tax payment lag. This difference in treatment accounts for a variance of approximately $3,000,000 in the rate base. This, of course, accounts for the fact that we arrive at a rate of return of approximately 6.60%, whereas the company finds a return of 6.54%.

It will be recalled that on November 7, 1960, this commission directed Southern Bell to reduce its rates and charges for telephone service within the state of Florida. The rates were reduced as directed; however, since that time, the company has experienced two wage increases which resulted from collective bargaining with their employees. Also, the company's casualty expense which resulted from the hurricane Donna, in September 1960, was not taken into consideration by the commission at the time the rates were reduced in November 1960. These wage increases and the casualty expenses are somewhat more than offset by the incidental increase in revenue which would result from the proposed regrouping. In other words, if we give full effect to the casualty expense, the wage increases, and the revenue increases from the proposed regrouping, the telephone company will have recovered approximately 25% of the rate reduction of November 1960.

In presenting its case in this proceeding, the company has not requested the allowance of what it would consider a fair rate of return and we have not considered this as a conventional revenue rate case where it would be necessary to find a reasonable rate base and a fair rate of return. However, as we have already indicated, we have considered it our duty to review the company's earnings so as to be sure that the incidental revenue increases involved in the proposed regrouping will not result in excessive earnings. Our study and consideration of the record herein and the company's operations and earnings indicate that the proposed regrouping, if revised to limit the revenue increase to $1,600,000, will not result in excessive earnings for the company but, on the contrary, will leave it in much the same situation as it was immediately following the rate reduction which we ordered in November 1960.

Based upon the entire record herein, the commission finds as follows —

1. The proposed regrouping of exchanges is fair and reasonable and establishes an equitable and non-discriminatory relationship between exchanges of comparable size.

2. The rates and charges proposed for the various groups will be fair, reasonable, and compensatory if revised to limit the additional gross revenue to be derived therefrom to the sum of $1,600,000 on an annual basis; provided, however, such revision shall not comprehend any increase in any classes of service in any exchange in excess of those involved in the pending proposal.

3. The automatic revision of the company's exchange grouping, from time to time in the future, will be reasonable and necessary if inequities and discriminations are to be avoided as the state continues its phenomenal growth. Such automatic revision of exchange grouping, however, should be carried out in strict conformance with rules and regulations which will be adopted by the commission establishing practices and procedures governing such revisions.

4. Subject to the findings herein, the company's local exchanges should be regrouped and placed under the new rates at the earliest possible date in order that presently existing inequities and discriminations may be discounted.

Now, therefore, in consideration thereof, it is ordered that the exchange regrouping proposed herein by Southrn Bell Telephone & Telegraph Co., and the rates proposed therefor, be and the same are hereby approved to become effective with all bills rendered on and after December 1, 1961; provided the applicable rates and charges are so revised that the additional gross revenue to be derived therefrom will not exceed the sum of $1,600,000 on an annual basis with no increases in any class of service in any exchange in excess of those involved in the pending proposal.