ASSOCIATION OF ROCK ISLAND MECHANICAL AND POWER PLANT EMPLOYEES et al. v. LOWDEN et al.

No. 1891–N.

District Court, D. Kansas, First Division.
March 26, 1936.

James E. Smith, Earl H. Hatcher, Frank H. McFarland, and Clayton M. Davis, all of Topeka, Kan., for plaintiffs.

Summerfield S. Alexander, U. S. Dist. Atty. for the District of Kansas, of Topeka, Kan., Leo F. Tierney and Harold F. Collins, Sp. Assts. to the Atty. Gen., of the United States, for defendants.

HOPKINS, District Judge.

The suit is one in equity testing legality of a contract whereby defendant railway undertook collection of dues owing to a company union by employees of defendant who were members of the company union. The contract provides for collection of the dues by means of pay roll deductions. The plan was first put in use in 1925 and the contract here involved was made effective in January, 1933. Legality of the contract is brought in question by reason of enactment by Congress in 1934 of an amendment to the Railway Labor Act (section 2, as amended by Act June 21, 1934, § 2 [45 U.S.C.A. § 152]), making it unlawful for a carrier to deduct from wages of its employees dues payable to labor organizations. Because of penalties imposed by the act for violation of its terms, the railway notified the union that effective June 21, 1934, it would no longer comply with the contract.

This suit was instituted July 12, 1934. Complainants (hereinafter referred to as the association) seek to enjoin the railway's discontinuance of the contract and to enjoin the District Attorney from bringing proceedings to enforce the statute.

The railway does not challenge the allegations of the complaint, but the District Attorney denies the allegations attacking the constitutionality of those provisions of which complaint is made, and denies that he was about to prosecute defendant or bring proceedings for violations of the statute.

Following institution of the action July 12, 1934, a motion to dismiss was overruled and the government, on July 3, 1935, answered. On November 6, 1935, the parties filed stipulations covering the evidence and were given extension of time to file briefs. Briefs were filed and thereafter argument was had on December 23, 1935. The parties filed suggested findings of fact, and on January 5, 1936, the case was submitted for final decision.

Findings of fact made by the court and an analysis of part of the evidence are separately filed. See, also, the note appended to this opinion, giving a brief historical review of the labor movement. A review of the facts so far as pertinent to the decision will follow later in this opinion.

It may here be observed that formation of company unions was an outgrowth of the general strike in 1922 of the mechanical employees of practically all the railroads in the country. The striking employees were supplanted by others who were not members of labor organizations. They were without organization and had no representative for the purpose of dealing with their employer in matters relating to collective bargaining. On July 3, 1922, the United States Railroad Labor Board passed a resolution, the preamble to which recited that it was "desirable, if not a practical necessity, for the employees of each class on each carrier to form an organization or association to function in the representation of the employees before the railroad labor board." The first paragraph of the resolution provided: "That it be communicated to the carriers and the employees remaining in the service and the new employees succeeding those who have left the service to take steps as soon as practicable to perfect on each carrier such organizations as may be deemed necessary for the purposes above mentioned." The officers of defendant company interpreted this as a suggestion or request and proceeded immediately to organize a company union, which grew into what is now the plaintiff association.

The contract (in controversy) dated December 15, 1932, provides:

"Whereas, The Association has requested the Railway Company, through the medium of pay roll deductions, to collect the monthly dues from members who have requested the Railway Company to do so, which Railway Company agrees to do upon following terms:

"First: Railway Company will, so far as it can legally do so, comply with request of Association by deducting the monthly dues from the pay of those employes who have filed with the Railway Company a request in writing that such deductions be made, and shall, in each case, file with the Railway Company an order of assignment of such deduction to the Association.

"Second: The Railway Company will make a monthly report * * * and remit to the Association monthly at the time of making such report the full amount of such deductions, less three (3%) per cent of such deductions as hereinafter provided.

"The Association agrees:

"(1) That it will pay to the Railway Company a sum equal to three (3%) per cent of amount deducted monthly by the Railway Company, the said payment to be in compensation and indemnity for the labor of making the deductions specified and paying the same less three (3%) per cent of amount deducted and to be remitted by it to the Association as hereinbefore provided. * * *

"That this agreement * * * shall remain in effect until it shall be terminated at the option of either party hereto, which may be by either party giving to the other 30 days written notice of the option of the moving party to terminate this contract, and at the expiration of such 30 days' notice this contract shall terminate."

Section 2 of the Railway Labor Act, as amended June 21, 1934, § 2, so far as important here, reads as follows: "It shall be unlawful for any carrier to * * * deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions." 48 Stat. 1186 (45 U.S.C.A. § 152).

In a general sense, the constitutional validity of the foregoing provisions is the only issue in the case.

Presumption of validity goes with the act. Courts always presume that the Legislature acts advisedly and with full knowledge of the situation, and its action must be accepted by the courts as that of a body having full power to act, and only acting when it has acquired sufficient information to justify its action. Chesapeake & Potomac Tel. Co. v. Manning, 186 U.S. 238, 245, 22 S.Ct. 881, 46 L.Ed. 1144.

In considering validity of statutes as affected by the power of Congress, it has been said: "The scope of judicial inquiry in deciding the question of power is not to be confused with the scope of legislative considerations in dealing with the matter of policy. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result,

whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." Chicago, B. & Q. R. Co. v. McGuire, 219 U.S. 549, at page 569, 31 S.Ct. 259, 263, 55 L.Ed. 328.

In Northern Securities Co. v. United States, 193 U.S. 197, 350, 24 S.Ct. 436, 462, 48 L.Ed. 679, it was said: "So long as Congress keeps within the limits of its authority as defined by the Constitution, infringing no rights recognized or secured by that instrument, its regulations of interstate and international commerce, whether founded in wisdom or not, must be submitted to by all." The duty of courts to give effect to legislative enactments was emphasized in Wilson v. New, 243 U.S. 332, 358, 37 S.Ct. 298, 306, 61 L.Ed. 755, L.R.A. 1917E, 938, Ann.Cas.1918A, 1024, in the following language: "While it is a truism to say that the duty to enforce the Constitution is paramount and abiding, it is also true that the very highest of judicial duties is to give effect to the legislative will, and in doing so to scrupulously abstain from permitting subjects which are exclusively within the field of legislative discretion to influence our opinion or to control judgment."

In support of its claim of invalidity of the act, the association argues several points. It points out in the first place, that valid contracts are property and protected under the Fifth Amendment against abrogation by act of Congress. This rule is subject, however, to the limitation that supervening conditions may warrant abrogation of contracts in exercise by Congress of its control over interstate commerce, or in its exercise of other powers specifically granted by the Constitution.

In Chicago, B. & Q. R. Co. v. McGuire, 219 U.S. 549, 567, 31 S.Ct. 259, 262, 55 L. Ed. 328, the Supreme Court said: "Freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. Crowley v. Christensen, 137 U.S. [86], 89, 11 S.Ct. 13, 34 L.Ed. 620; Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765." In Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, at page 202, 31 S.Ct. 164, 169, 55 L.Ed. 167, 31 L.R.A.(N.S.) 7, the court in considering constitutionality of the Carmack Amendment (49 U.S.C.A. § 20 (11, 12), as affecting contractual relations between railroad and shipper, said: "It is obvious, from the many decisions of this court, that there is no such thing as absolute freedom of contract. Contracts which contravene public policy cannot be lawfully made at all; and the power to make contracts may in all cases be regulated as to form, evidence, and validity as to third persons. The power of government extends to the denial of liberty of contract to the extent of forbidding or regulating every contract which is reasonably calculated to injuriously affect the public interests. Undoubtedly the United States is a government of limited and delegated powers, but in respect of those powers which have been expressly delegated, the power to regulate commerce between the states being one of them, the power is absolute, except as limited by other provisions of the Constitution itself." The association concedes these limitations to the rule, but contends that exercise of the commerce power by Congress in regulating the relations between the carriers and the employees to the extent of affecting existing contracts, is subject to the limitation of the Fifth Amendment to the extent that the particulars in which those relations are regulated must have a real or substantial connection with interstate commerce in which the carriers and the employees are engaged.

The association concedes that Congress has the power to pass legislation insuring the employees the right to choose their representatives without influence, interference, or coercion by the employer, but contends that the instant contract for the collection of dues through the medium of pay roll deductions between the employees' association and the railway company was voluntarily entered into by the company, the individual employees and the association, and being subject to cancellation by either party at any time, does not substantially affect interstate commerce, argu-

ing that the contract can in no way be used to constitute influence preventing freedom of choice by the employees or their representatives.

The association contends further that although the contract might in isolated instances be used as a means of influence or tempt the use of influence, Congress cannot strike it down merely because the contract, growing out of normal relations, might be used as a means of influence or tempt the companies to exercise influence. That Congress cannot prohibit the normal relationship, but can only prohibit its being used as coercion or influence constituting pressure in the employees' freedom of choice.

The association summarizes its contentions thus: The collection of dues under the plan here considered does not affect or relate to interstate commerce, and is therefore beyond the power of Congress; or, if related to interstate commerce at all, it does not affect it substantially, but only indirectly, and, therefore, the contract is protected by the Fifth Amendment.

■ Is there substantial connection between interstate commerce and a statute prohibiting collection of company union dues by means of pay roll deductions? Other features of this act than the one prohibiting pay roll deductions have been upheld by the Supreme Court, and it is definitely established that it is within the power of Congress to prohibit whatever may operate to interfere, influence, or coerce employees in choosing representatives who shall serve them in matters of collective bargaining.

This was established by the case of Texas & N. O. R. Co. v. Brotherhood of Railway S. S. Clerks, 281 U.S. 548, 570, 50 S.Ct. 427, 433, 74 L.Ed. 1034, wherein the court, in construing the Railway Labor Act (45 U.S.C.A. § 151 et seq.) prior to the amendment here involved, stated: "We entertain no doubt of the constitutional authority of Congress to enact the prohibition. The power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement' (The Daniel Ball, 10 Wall. 557, 564, 19 L.Ed. 999); to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U.S. 691, 696, 697, 26 L.Ed. 238); to 'foster, protect, control, and restrain' (Second Employers' Liability Cases, 223 U.S. 1, 47, 32 S.Ct. 169, 174, 56 L.Ed. 327, 38 L.R.A.(N.

S.) 44). Exercising this authority, Congress may facilitate the amicable settlements of disputes which threaten the service of the necessary agencies of interstate transportation. In shaping its legislation to this end, Congress was entitled to take cognizance of actual conditions and to address itself to practicable measures. The legality of collective action on the part of employees in order to safeguard their proper interests is not to be disputed. It has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work. American Steel Foundaries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360. Congress was not required to ignore this right of the employees but could safeguard it and seek to make their appropriate collective action an instrument of peace rather than of strife. Such collective action would be a mockery if representation were made futile by interferences with freedom of choice. Thus the prohibition by Congress of interference with the selection of representatives for the purpose of negotiation and conference between employers and employees, instead of being an invasion of the constitutional right of either, was based on the recognition of the rights of both."

The association concedes that "insofar as Congress' real purpose was to insure that representatives for the purpose of the Act, shall be designated by the respective parties without interference, influence or coercion exercised by either party over self-organization or designation of representatives by the other, the validity of the act cannot be disputed."

The specific issue then simmers down to whether or not the means selected—prohibition of pay roll deductions as means of collecting dues payable to labor organizations—is reasonably calculated to prevent influence, interference, and coercion in relationships of railway and its employees, and has a substantial relation to the objects sought to be attained by the act as a whole.

The purposes of the act are many and among which is to forbid any limitation upon freedom of association or any denial of the right of employees to join a labor organization, and to provide for the "complete independence of carriers and of em-

ployees in the matter of self-organization." Railway Labor Act § 2, as amended, 45 U.S.C.A. § 151a.

In determining the specific issue, as above stated, an objective view of the actual operation of the pay roll deduction plan must be had. The facts must be considered.

Following the strike in 1922, the employees then in service were inexperienced in railroading and in collective bargaining. The President of the Rock Island (and the Gulf) issued a statement in which he said:

"These companies are not negotiating a settlement of the shopmen's strike with the officers of the shop craft organization.

"An association of Rock Island Employees is being formed by those now in the service with which all future negotiations will be conducted."

Petitions were prepared by the officers of the company for circulation among the employees for the formation of the association. The petitions made provision for the manner in which committee members were to be selected, and elections were to be held. The company defrayed expenses of employee representatives incurred in attending a meeting at Chicago, Ill., for the purpose of perfecting the organization and adopting a constitution and by-laws. The original by-laws were prepared by the officers of the company, who also authorized and supervised the enactment of subsequent amendments. Originally various requirements were exacted of employees entering the service of the company, which in the passing of the years have been abandoned. For instance, the original by-laws, article VIII, § 5, provided: "It shall be the duty of the secretary-treasurer to make reports to the master mechanic or superintendent of shops once each month, posting on the bulletin boards the names of employees who at any time cease to be members of the Association."

This section remained in force until October 17, 1933, after the passage of the Emergency Railroad Transportation Act, 1933 (49 U.S.C.A. §§ 5, 5a, 15a, 15b, 19a, 250–267).

The original by-laws, Article IX, § 5, provided: "It is hereby mutually agreed between the members of this Association, that during the period of their employment by the Chicago, Rock Island and Pacific Railway Company, the Chicago Rock Island and Gulf Railway Company, that they will not join any other trade union, association or like organization covering same kind of work as that performed by members of this Association, where such association, or organization's obligations is in any conflict with these by-laws."

This section remained in force until March 1, 1927.

Article IX, § 6 of the original by-laws provides: "It is agreed that the Association of the Rock Island Mechanical and Power Plant Employees will not as a whole, affiliate themselves with any other organization, fraternal, political, religious, labor, or of any other nature whatsoever that in any way interferes with the principles of this Association. Neither will this Association lend its name to any publication, advertising matter, merchandise, correspondence schools, souvenirs, or any matter whatsoever."

This section remained in force until October 29, 1934. Employees were required to execute a contract containing the following provisions: "I agree that during the entire period of my employment by the Rock Island Lines I will neither directly or indirectly become a member of, or in any manner associate with any other trade union, association, or organization the members of which are principally engaged in the mechanical work of the kind or character performed by me, and I further agree that any act on my part in becoming a member of, or in any manner associating myself with any other such trade union, association, or organization may be considered by the hiring officer as my resignation from the employ of the Railway Company. This declaration to be filed with my regular application."

This provision was not abandoned until after the passage of the Emergency Railroad Transportation Act, 1933. Employees, if any, entering the services of the company for the first time after April 26, 1924, were not required to sign such contract, but all employees who previously signed (which covered most of those heading the seniority list) continued to be bound thereby until 1933.

The contract for collection of dues from the employees provided for a compensation to the company of 3 per cent. of the amount collected.

The company assigned an officer with the title of "Supervisor of Welfare" to keep in close contact with the affairs and

activities of the association. This official encouraged and counseled the officers of the association, and regularly attended their official meetings. In one of his letters, the following was stated:

"Now, another matter, which, while we may not have lost sight of altogether, has been pigeon-holed temporarily, so to speak, in view of the fact that we have been getting along so remarkably well and with little or no indication of any disturbance at any point over the railroad. I refer to the activities of the American Federation of Labor. I do not want to sound an undue note of alarm, but I am just as confident as I can be that there are men on and off the railroad who, if they had the slightest opportunity would do anything and resort to any measure in order to disturb and oppose our present organization.

"We cannot, afford to allow this to happen and may I urge that each member of the System Committee be on the alert constantly and that a reliable point of contact be established and maintained at all points where such contacts are possible to the end that all such unfriendly activities be nipped in the bud." (Ex. 21.)

█ The association points out that the foregoing practices have been discontinued and urges that the pay roll deduction plan, as now exercised by it, is not iniquitous and should not be subjected to the ban of the statute. The answer is that validity of the statute is not to be determined wholly from its application to past situations and circumstances. The act looks as well to the future. In Delaware, L. & W. R. Co. v. United States, 231 U.S. 363, at page 370, 34 S.Ct. 65, 67, 58 L.Ed. 269, it was said: "The courts are not concerned with the question as to whether, in a particular case, there had been any discrimination against shippers or harm to other dealers. The statute is general, and applies not only to those particular instances in which the carrier did use its power to the prejudice of the shipper, but to all shipments which, however innocent in themselves, come within the scope and probability of the evil to be prevented."

The association's contention the pay roll deduction plan is not attended with the objectionable elements of influence, interference or coercion, impeaches the congressional conclusion to the contrary. Congress investigated the subject before enacting the disputed provision. It appears that among other things, Mr. Joseph B.

Eastman, member of the Interstate Commerce Commission and Federal Co-ordinator of Transportation, testified before the Senate Committee that "The reason is that a railroad is thus given information as to whether or not employees are paying dues in an association. It is very easy for the railroad to create the impression, or for the employees to get it in some other way, that the fact they do or do not pay dues will have some influence upon their record with the railroad company. It would seem to me that is a thing that the labor organization ought to handle for itself. I do not see why the railroads should mix in it." Hrgs. before Sen. Comm. on Interstate Comm. on S. 3266, April 10, 1934, p. 23.

Mr. Eastman also appeared before a House Committee at the time the amendments to the Railway Labor Act were being considered. Speaking of influence inherent in certain company union arrangements, he said:

"You must realize the influence which a company is able to exert over its employees, if it cares to use it, particularly in a time when jobs are not to be had for the asking. It is like the power of life and death, for it means the power to deprive a man of the very means of subsistence. The influence may be exerted at a time when a man wants a job, by making him agree to limit his freedom of choice in the matter of labor organizations, or it may be exerted after he becomes an employee, by instilling in him the fear that if he does not do as the company wishes, he may lose his job. Bear in mind that there are any number of plausible reasons which may be conjured up for demotion, or dismissal, and that the real reason need not be brought out into the open. In addition to this use of fear, which is a most potent instrument of influence and easy to imply, there is the hope of gain. This is utilized by paying the salaries of officers or in other ways meeting or helping to meet the expenses of favored organizations and extending concessions of this sort to them which would not be extended to other organizations which are not favored.

"In the investigations which my staff have made, I have gone rather exhaustively into this matter, and I entertain no doubt whatsoever that the chief reason why railroad managements prefer so-called 'company unions' is because they can more readily influence their policies and manage-

ment than would be the case with national organizations. I do not mean necessarily any sinister influence. They may feel, and I suppose they do, that they know what is for their employees' own good. However, they ought not to be the ones to decide what is for their good." Hrgs. before House Comm. on Int. and For.Comm., H. R. 7652, May 22, 1934, p. 23.

In further speaking before the Senate Committee on the same topic, Mr. Eastman stated:

"The influence of employee against employee. What constitutes such undue influence? When employees are dealing with employees, the situation is quite different from what it is when companies are dealing with employees. Companies have power over the means of livelihood of employees, and that is where the danger lies. Advice from a boss may easily become coercion, if the impression is in any way conveyed that failure to follow the advice may threaten the standing of the employee with the company. It is like advice from a man with a six-shooter pointing at your head.

"Employees have no such power over each other. When it comes to the organization of employees, it is entirely appropriate and proper that argument and electioneering should be allowed. Contending factions may misrepresent in their arguments, just as Republicans and Democrats do, but each side may be relied upon to expose the misrepresentations of the other. Hrgs. before Sen.Comm., S. 3266, April 19, 1934, pp. 148, 149.

A contention that the pay roll deduction plan "is attended with no element of interference, coercion or influence," is answered by defendants in directing attention to a letter entitled "Important Instructions," which Mr. McConnell, secretary and treasurer of the association, issued to the several local secretaries of the association at the time the plan was put into operation.

In enumerating the virtues of the plan, Mr. McConnell states, among other things, that "it saves the Secretary the time and trouble of selling the member the Organization each time he goes to collect from him, which is the case in some localities." Defendants argue that this statement reasonably justifies the inference that some members were not wholeheartedly "sold" with the association, and when read in the light of the context, it justifies the further inference and claim that the entire plan is a subtle device to influence the working men to retain membership in the association. The latter described in detail the manner in which pay roll deduction shall be made. Mr. McConnell's assertion that "the management is cooperating with us in this new plan" appears to be borne out by his later statement: "As a prize in this contest, the System committee is going to write a letter to Mr. J. E. Gorman, the President of the Railroad, telling him of the zeal which has been displayed by the first Local becoming 100% under the plan. Likewise a letter will be sent for the first Division Local becoming 100% under the deduction plan. Also a letter will be sent him calling his attention to the first entire Division which is 100% under this plan. In these three letters, we propose to call his attention to the zeal which has been displayed, both on the part of Officials governing the respective jurisdictions and the Local Officials of the Railway governing these jurisdictions in their cooperation with the Local Officers of our Organization; also calling his attention to the attitude displayed by the membership. This, we feel, will be a distinction for the Local, Division Local or Division to try for. If you wish to get into the race, order your deduction slips today and start to work on it." The pay roll deduction plan requires for its successful operation that subordinate officials of the management be apprised of the names of employees who have accepted the plan. These subordinate officials were informed in the following manner: "As soon as these forms are signed, turn them to your Master Mechanic or if you are located where there is no Master Mechanic, turn them over to your General Foreman, who will in turn send them to your Master Mechanic. Your Master Mechanic will then make a record of these deduction slips and forward them to the System General Headquarters at Topeka, and we will make such notations in our files as has been arranged by the System Committee and the management, and the System Secretary-Treasurer will in turn forward the deduction orders to the Sub-District Time Accountant under whose jurisdiction your local is, with reference to the accounting."

The association contends that the plan is the result of voluntary action on the part of the employees and that the latter are not obligated to participate therein,

and, therefore, the plan cannot involve the exercise of unwarranted interference or influence. Congress took another view of the plan, no doubt finding it difficult to reconcile such assertions with the state of affairs portrayed in a letter which bluntly states that the president of the railroad is to be kept informed of the "zeal" of the men in subscribing to the plan. A reasonable process of reasoning would undoubtedly cause a working man who aspired to retain his job to do the bidding of his employer, even in matters not related to his duties as an employee and respecting which his personal preferences might be different; and he will do the employer's bidding with more alacrity and less protestation when he knows the employer will be advised of the "zeal" with which he responds. I am of the opinion the letter fully sustains the apprehension of Congress which prompted the prohibition of pay roll deductions on the ground that the plan was a subtle and insidious method of exercising influence over working men in order to insure their continued membership in company unions, even though they were not "sold" with the virtues of such unions.

In an election conducted by the National Mediation Board, pursuant to section 2, Ninth, of the Railway Labor Act, as added by Act June 21, 1934, § 2 (45 U. S.C.A. § 152 (9), a majority of employees, by secret ballot expressing their choice of representative, did not vote for the association. This fact alone strongly points to the influence exerted by the check-off system.

The foregoing evidence, viewed in its entirety, depicting the plan of the company in organizing the association and the manner of execution, establishes, in my opinion, a continuous, persistent form of influence, interference, and coercion, destroying that freedom of thought and action guaranteed by the Railway Labor Act (45 U.S.C.A. § 151 et seq.) in matters of negotiation and bargaining between the railway and its employees.

■■ I conclude that the provisions of the Railway Labor Act in question do not violate the Fifth Amendment of the Constitution of the United States, that the enactment constitutes a proper exercise of power by Congress, and there is no basis in fact or law for enjoining the United States Attorney from enforcing the provisions of the act, or from prosecuting the defendant trustees for violations thereof.

A proper decree may be drawn dissolving the temporary injunction heretofore issued and dismissing the bill of complaint.

---

Note.
Brief Summary of Labor Movement.

From the beginning of time man has been confronted with his labor problems. Always and ever he has fought for food and shelter for himself and his family. Always he has been confronted with the question of his next purpose. Wearied with his day's labor, he has been too willing to permit others to do his thinking and to blindly follow those who have assumed leadership. Nearly all his toil has been drudgery to him. With the march of his intellect, his desires have required constantly increasing effort. He has continually struggled to reduce the amount of labor needed for gratification of his increasing wants. From his earliest period, when original man obtained his needs from nature, he was even then endeavoring to have his work done for him by others. Usually that other person was his wife. His effort to reduce the amount of his labor continued, and usually improved his status. It sometimes, however, resulted in the development of slavery and serfdom.

Man had his migratory stage and his pastoral stage, and while keeping his flocks, had no labor troubles. In the agricultural period of the Middle Ages, the human race became divided into classes, one group represented by the lords, the other by the serfs and slaves.

There originated free towns to which serfs could flee and become citizens. This eventually broke up the relation of lord and vassal and in the towns the workers' condition was vastly bettered.

There was the "handicraft period" during which the family manufactured what it needed. There was no employer, no employee. During this period was marked the real beginning of civilization. He who made good blades made nothing else. Each individual or family centered effort in the making of a single product. What they made in excess of their needs they exchanged, creating a system of buying and selling under control of merchant guilds. Eventually craftsmen also organized guilds which regulated quality, quantity, and relationship between guilds.

When Elizabeth went to the English throne (1558), craft guilds had lost power. Homecraft work, with agricultural labor, returned to freemen of the soil. During this time marketing was carried on by middlemen who sold the finished product.

During the period of the Renaissance,

laws were enacted in England which later were to affect labor conditions. An epidemic from 1348 to 1350 brought death to more than half of the British workers and caused a scarcity of labor (the Black Death). Increased wages were demanded. Then followed passage of laws which forced workers to accept employment at rates scheduled by law. These were the "Statutes of Labourers," enacted from the fourteenth to the eighteenth century.

In 1349, King's Council proclaimed the Ordinance of Labourers to assure sufficient labor at the wage rate usual before the epidemic. Under penalty of imprisonment for conspiracy, persons able to toil were required to accept offers of employment.

Nearly all governments have required citizens to perform certain services. Forced labor in the form of military conscription still is in existence in most countries.

Roman citizens were required to work on public projects. Egyptian irrigation canals were kept by forced labor. Indians were apportioned in America in 1499 among Spanish settlers and required to work. Slavery began in the United States when twenty negroes were landed in Jamestown in 1619. In some of our own states able-bodied men still are required to work on the roads a definite number of days (poll tax).

In the American colonies few workers were available for the arduous tasks which confronted the pioneers. Unceasing toil was required to prepare the land for cultivation, build roads, houses, and beat back the attacking Indians. The owners of the small farms in the North fared somewhat better with the labor problem inasmuch as they had the help of the family to cultivate the land. Occasionally others were hired.

Southern colonies, largely composed of huge plantations, faced a constantly increasing need of laborers. The few immigrants who came to the colonies and hired themselves out as free laborers were insufficient for the need.

Other workers were indented servants and slaves. The indented servants were voluntary and involuntary. The voluntary servants contracted with an individual or company for a definite period of service in return for payment of their transportation and maintenance during their periods of service. Such servants were free persons who came to the colonies to improve their conditions. Those brought here before 1650 usually were bound for periods of seven to ten years. Later, the periods of service were reduced to four years. At the end of his contract, the voluntary servant often became an independent proprietor and highly respected citizen.

Involuntary servants, classified as "loose and disorderly persons," vagrants, criminals, or paupers, were sent to the colonies by court sentence or royal order. Many of such persons were guilty of nothing more than debt, an offense in those days punishable by imprisonment.

In the colonial period, wage earners largely were artificers, mechanics, and similar skilled workers. Independence of the colonies made slight difference in their status. The unskilled laborers worked from sunrise to sunset, obtaining scarcely nothing beyond the bare necessities.

McMaster, depicting the home and garments of a worker of the period of about 1790, relates "Sand sprinkled on the floor did duty as a carpet. There was no china in his cupboard, no prints on his wall. He was unacquainted with stores, coal or matches. He rarely tasted fresh meat and paid for it at a price much higher than his posterity. * * * If the food of an artizan would now be thought coarse, his clothes would be thought abominable. A pair of yellow buckskin or leathern britches, a red flannel jacket, a checked shirt, a rusty felt hat cocked up at the corners, shoes of neat's skin set off by huge buckles of brass, and a leathern apron comprised his scanty wardrobe. He smeared the leather with grease to keep it soft and flexible."

The worker of the early colonial period had few rights and feeble protection of them. Irregularly paid, he was unable to secure his wage by a lien on the product of his labor. If he incurred indebtedness, he could be put into prison and held until the debt was paid. Unless he possessed property he had no right to vote or hold office.

Printers, one of the most intelligent groups of skilled craftsmen, appear to have been the first of the organized workers in this country, 1786. Shoemakers were organized eight years later. In 1827, according to labor historians, there was a general movement by all branches of labor, but all such organizations were confined to skilled workers. The unskilled worker continued without voice or organization. In this period labor had no influence upon legislation.

Consideration of workers as a whole involves a definition of the word "labor" to determine the structure of that assembly of society designated in the use of this term. Varied attempts have been made to define it.

F. W. Taussig in "American Labor Legislation Review" has made these classifications:

(1) Unskilled workers, casual labor.

(2) Semiskilled workers including the growing list of machine tenders.

(3) Skilled craftsmen, e. g., building

tradesmen, typesetters, railroad employees, and machinists.

(4) "White-collar" workers including office employees, bookkeepers, stenographers, salesmen, and clerks.

(5) Self-employed or high-salaried officials intrusted with great business responsibility—the business executives of the day.

Taussig defines two classes of workers. One class made up of three groups which he calls the "hardhanded" type; the other class consisting of two groups which he describes as the "soft-handed" type. The "hard-handed" workers represent the common conception of laborers and labor. An exact definition of labor is difficult. The idea of labor might be made clearer by consideration of common attributes usually found in the laboring group. Labor is made up of men, women, and children who are:

(1) Gainfully employed in the wealth creating processes of modern society.

(2) Generally, but not always, using tools and equipment furnished them by others.

(3) Selling their services, mental as well as manual, for wages, i. e., definite time or piece payments provided by their employers who usually advance these payments sometime before the products reach consumers.

Though this classification may be a somewhat narrow conception of labor, it corresponds with popular usage.

The group known as "agricultural labor" has received special attention. Members of it usually are considered as those who are employed by owners or renters of land. Frequently this group is not included in the common idea of labor, perhaps due to their isolation from other workers and nonparticipation in any labor organization and their frequent change into and out of the class of renters.

Women's toil drew no general public attention until the development of factory machines.

From its conception our country has attracted the wanderers, the discontented, the ambitious, the oppressed; some seeking freedom from irksome regulations of the old world, some for political ambition, some for profit. To virtually all of them their newly adopted country was home. Those pioneers soon evolved definite standards of equality and labor.

Labor historians apparently agree that unionism did not originate in the craft guild of the middle ages. "Modern trade unionism," says Commons, "as an industrial and political force, began with the coming together of previously existing societies from several trades to form a central body on the representative principal."

American labor organizations are the result of conditions brought about by the Industrial Revolution. The Industrial Revolution's main features—the factory system and the use of power-driven machinery—performed operations formerly done by hand. Consequently, employers sought wage reductions. Workers then formed the first true labor organization in this country—the printers in 1786 and the shoemakers in 1794; both unions in Philadelphia.

The period of local craft unions has been designated as between 1792 and 1826. However, there were loose organizations of craftsmen before those dates. One of the first "understandings" between craft workers was among journeymen printers in New York City in 1776 when a demand for an increase of wages was made by them, and refused by their employers. A strike was called. The printers' demands appear to have been complied with. In Philadelphia in 1786, an attempt was made by employing printers to reduce wages to $5.83 a week. Craftsmen held a meeting May 31, 1786, adopted resolutions to the effect that they would "not engage to work for any printing establishment in this city or county under the sum of $6.00 per week," and would "support such of our brethren as shall be thrown out of employment on account of their refusing to work for less than $6.00 per week."

The resolution was signed by twenty-six printers. There are indications that the struggle with their employers lasted some time. As in the previous decade, the organization of the craftsmen disintegrated after winning its objectives.

Although the carpenters are credited with organizing the first union (1791), their united efforts appear to have continued no further after a strike in that year.

Other craft unions organized in the first years of the new century (1800), were local units. There was yet no real competition among workers from the different cities. These local unions sought collective bargaining, apprenticeship regulations, shops closed to workers who refused to join their organization, and freedom from prosecution for conspiracy.

The first wage scale offered in this country was prepared in 1800 by unionized printers of New York.

Political activity of trade unions became definite in the decade between 1827 and 1837, when widening of markets through better transportation made uniform wages and hours more important to workers. Rising prices—the result of money inflation—created more discontent, as did lack of educational opportunity and universal suffrage for men. Imprisonment for debt

was common for workers. The result was local federations of craft unions, the first being formed in Philadelphia in 1827 and known as the Mechanics Union of Trade Associations. From that organization a year later originated the first labor party, the Working Men's Party, which predominated in New England and included mechanics, tradesmen, and farmers. The Working Men's Party lasted about three years, but others appeared. Their aims included abolishment of imprisonment for debt, elimination of compulsory militia service, establishment of free schools, simplification of court procedure, taxation reforms and regulations of monopoly and credit institutions. Further efforts toward expansion and co-operation were halted by the panic of 1837. In this period of depression, many groups of workers gave heed to agitators and reformers. Politics divided union membership and brought about the breakdown of increased organization.

In this period of political activity by unions (1827–1837), various labor parties were organized in almost every state to secure reforms by political action. Perhaps the most important of these was the National Trades' Union, organized in August, 1834, in New York. The delegates were from trades' unions of New York, Philadelphia, Boston, Brooklyn, Poughkeepsie, and Newark. In this organization, which lasted about three years, there appeared definite reaction against political activities.

In the prolonged depression came a final Utopianism and humanitarianism that worked itself out in a universal failure of various impractical documents and experiments. Workers turned to general reforms and improvements of labor as a whole. Even then there was a difference of opinion as to the nature of unionism. Craft unionism yielded to attempts to form broader ties among the workers. Industrial conventions and "working-class congresses" were called. All of them followed almost blindly the doctrines and panaceas offered by leaders who had not risen from their ranks.

Professor Hoxie (R. F. Hoxie "Trade-Unionism in the United States") describes this period (1840–1850), as "uplift unionism." Perhaps the most conspicuous illustration of this uplift unionism was found in the Knights of Labor organized about twenty years later (Thanksgiving, 1869), by a tailor, Uriah Smith Stephens, who had been educated for the ministry.

Innate level-headedness of American workmen weakened their faith in social panaceas. The pendulum swung back to more practical solutions of their problems.

Discovery of gold in California began an industrial revival, and with increase of employment, unionism separated itself from Utopian theories and returned to the restrictive craft form.

In this period (1850–1857) began the most important form of expansion of labor organization. That was the joining together in nation-wide organizations of local unions of one trade. Although the printers had organized nationally in 1836, that organization lasted scarcely two years. In a national convention of the printers, held in New York City in December, 1850, was established the National Typographical Union.

Half a dozen other national organizations were formed before 1860. Recognition of the union and collective bargaining were their main issues. The panic of 1857 again shattered the labor movement but failed to destroy some of the national organizations.

When war between the states was imminent, a small group of organized workers sought compromise. In a labor convention in Philadelphia, Wm. H. Sylvis, president of the International Molders' Union, spoke in favor of a compromise suggested by Congressman Crittenden of Kentucky, but when Fort Sumter was fired upon, labor gave its allegiance to the United States government. Many local unions enlisted on the call of President Lincoln.

Thousands of workers left their tasks to take up arms. The period of the Civil War has been termed a second American Industrial Revolution. Although few labor organizations trace their history to the decade of the fifties, authorities state that the war between the states is responsible for industrial changes which made labor organizations permanent factors in this nation.

Prosperity returned with the war's demand for virtually every sort of manufactured product. So many workers had responded to the call of President Lincoln that the demand for labor could not be filled. The scarcity of workers was increased in 1862 when the Homestead Act was enacted (12 Stat. 392) causing many workers to become pioneer farmers. In 1864, the dearth of workers caused Congress to enact a law giving employers' agents authority to go abroad and make contracts with workers to come to the United States. The workers paid for their ocean passage by their labor. Children, women, and convicts were employed and in their effort to keep up with production, employers turned to labor-saving machinery.

The union movement, taking life in 1862–1863, had made noticeable gains by 1864 which continued for a few years. Eleven national unions were formed from 1863 to 1865.

Enthusiasm for unionism definitely in-

creased immediately after the close of the war between the states. A national labor congress was held in Baltimore in 1866. What appears to have been an outgrowth of that congress was the National Labor Union which held annual conventions from 1867 to 1872 inclusive. It was a somewhat feeble federation of local, state, and national unions which favored an eight-hour day for all workers. Sylvis, of the Iron Molders, was elected its president in 1868 but died the following year. A meeting held in 1872 was the final one of this union.

Another labor leader of this period was Ira Steward, a self-taught machinist of Boston, from whose theories the eight-hour movement drew its inspiration. Steward believed that the amount of wages is determined by no other factor than the worker's standard of living. The level for raising the standard of living was the eight-hour day. A couplet favored by labor speakers of that period ran thus:

"Whether you work by the piece
Or work by the day,
Decreasing the hours
Increases the pay."

Though the National Labor Union lasted only six years, it is historically significant (authorities state) because it reflected labor attitudes and aims of that period.

It was a national federation of city assemblies which were made up of local craft bodies. National craft unions were affiliated but were not organic units. Other units included reform and radical organizations. Its membership was estimated at approximately 540,000.

In general its original programs were practical, but under influence of idealistic and radical leaders, its original principles gradually were replaced by more socialistic theories. Its aspirations became so advanced—including proposals of organization of negro workers and exclusion of Chinese—that its proponents were unable to preserve it.

Its decay did not end efforts toward national federation. National trade unions—withdrawn from the National Labor Union when that organization adopted politics—attempted development of a national federation. It was the first organization with characteristics of the American Federation of Labor. Fundamentally, it was economic, but included legislative demands. A call appeared in the Workingmen's Advocate, published May 3, 1873, signed by officials of four international unions.

"Let not the failures of the past deter us from making renewed efforts," the plea urged. An invitation was extended to "every trade organization in the United States." A convention in Cleveland July 15, 1873, was scheduled. The purpose of the signers of the call was stated that "the organization, when consummated, shall not, so far as in our power to prevent, ever deteriorate into a political party, or become the tail to the kite of any political party, or a refuge for played out politicians, but shall to all intents and purposes remain a purely industrial association, having for its sole and only object the securing to the producer his full share of all he produces."

Seventy delegates attended the convention. Six national trade unions were represented. Labor historians state that the proceedings were more like a convention of the American Federation of Labor today than a convention of the old National Labor Union.

According to Commons, "had the industrial prosperity continued, the new federation undoubtedly would have attained an important place in the labor movement; but having been launched only two months before the panic and ensuing depression, it was doomed to failure."

Thus faded the "Industrial Brotherhood," blood relative of the American Federation of Labor. The panic of 1873 initiated a bleak period for wage-earners that lasted half a dozen years and included violent strikes, terrorism in some localities, and marked reduction in the number of national craft unions, reducing the total number from about 32 to 8.

The National Labor Union (1867–1872) succeeded the National Trades' Union of the thirties and preceded the Knights of Labor and the American Federation of Labor. It imaged new problems evolved by railroads, telegraph, and paper money.

What has been rated as "the largest labor union of the world," during that period, was the Knights of St. Crispin, founded in 1867, a year after the organization of the National Labor Union. It was an association of shoemakers, organized principally to defend shoe craftsmen from the inroads of shoe machinery by preventing unskilled workmen being operators of shoe machinery. The organization grew rapidly. In its first national convention in 1868, charters were issued to 600 chapters. Soon a membership of 40,000 was claimed. In 1872 the membership was listed as nearly 50,000. As were the printers and cigarmakers, the shoemakers were compelled to admit women in their locals. In 1869 the Daughters of St. Crispin was organized. Its members were women shoemakers. Labor historians classify Knights of St. Crispin as the "first great protest of American workmen against the abuse of the machine."

The Knights of St. Crispin and auxiliary thrived but briefly and died in the panic of 1873.

In the six-year depression from 1873 to 1879 employers attempted to separate themselves from unionism. McNeill states: "A great deal of bitterness was evinced against trades union organizations. Men were blacklisted to an extent hardly ever equalled." It became "very difficult to find earnest and active members who were willing to serve on committees."

As a consequence, "labor leaders met silently and secretly." They advocated an organization "hedged about with the impenetrable veil of ritual, sign, grip, and password, so that no spy of the boss can find his way in the lodgeroom to betray his fellows."

Such was the pattern of the labor organization of the seventies. Of that type was the Knights of Labor which had originated as a local union of garment cutters. Organized in Philadelphia in 1869 by Uriah Smith Stevens (or Stephens), a tailor who had been educated for the Baptist ministry. Secrecy as to its membership and operations was maintained by the organization, which attracted no particular attention until the depression of 1873, and after, when so many national trade unions were dissolved. It has been cited as the best example of "one big union." Craft lines were disregarded. Virtually every one except "bankers, lawyers, stockbrokers, gamblers and those making or selling intoxicants" was admitted. Unions that survived the panic found it to their advantage to join the Knights of Labor. Its membership was principally in factory cities of New Jersey, New York, Massachusetts, and Pennsylvania and a few other states, but did not extend west of Pennsylvania. Railway strikes of 1877, and criminal acts of the Molly Maguires in Eastern Pennsylvania following defeat of an anthracite miners' strike, created suspicion by the public against labor organizations that dwelt in secrecy. So having nothing to conceal, the Knights of Labor discarded its cloak, adopted a new program and named it as its preamble. The preamble, adopted and announced in 1878, was idealistic, declaring that the organization stood for equal pay for equal work of both sexes, producers' co-operation, enactment of a weekly pay law, education, a law against child labor, the eight-hour day and various other tenets that in that period were advanced in theory. General aims of the organization were the uplift of mankind; securing for workers more of the wealth they helped create; dependence upon political action, and producers' co-operation, which became its chief plank. The Knights' program was the broadest of its time. The sympathetic strike was its principal weapon, but to be used only as final recourse. Strength of skilled workers in bargaining was to be used as a fulcrum upon which the organization would rest its lever in elevating the condition of unskilled workers.

That phase, and the theory that the interest of all employees were the same, were contributing factors of the disintegration of the Knights of Labor. But not until after it had attained powerful growth and was nationally regarded as a predominating factor in labor. In 1885 the New York Sun assigned one of its reporters to write a news account of the plans and membership of the Knights of Labor. The article was reprinted and commented upon by many newspapers and magazines, increasing the prominence of the organization.

However, historians seem to agree that the Knights' membership and power was overestimated; that its largest membership—about 750,000 in 1886—lasted but a few years. With its political entanglements, failure of its exaggerated co-operative theories, loss of strikes in 1885–1886, its membership had decreased to approximately 100,000 in 1900 and a few years later it was only a memory.

In the virtual disintegration of the union labor movement in the seventies another organization that, with the Knights of Labor, managed to retain its identity, was the Cigar Makers' Union. Not so idealistic as the Knights, nor of such pure American strain, it was headed by a German, Adolph Strasser, and an Englishman, Samuel Gompers. Gompers then was head of the New York Cigar Makers' Union; Strasser, a Socialist, had turned to trade unionism as a practical way to improve the workers' condition. He was named president of the national organization of the cigarmakers in 1877 while a bitter strike was under way by New York cigarmakers against the tenement house system of manufacturing cigars. The strike failed and Strasser and Gompers reorganized the Cigarmakers' Union, discarding their Socialistic ideas and accepting the capitalistic system. Their goal was to improve the workers' status within that system. Their policy was unusual in that the Knights of Labor and most of the labor leaders looked toward co-operation as a substitute for the wage system, or even socialism in place of capitalism.

The position of the cigarmakers set definite lines for a struggle that is not yet settled. Either labor should adopt an idealistic policy, fighting for the welfare of all workers, or be governed by circumstances; accepting conditions as they

were and fighting for benefits for only those within its group.

The labor movement revived with business prosperity in 1879. An eight-year period (beginning with 1879) has been designated as an "upheaval and revival" in labor. Eighteen national unions are listed as being in existence in 1880. Three were organized in the 50's; five in the 60's; one in 1870; three in 1873; one in 1874; one in 1876; two in 1878, and one in 1879. Many city federations began organizing. The Knights of Labor flourished and received widespread publicity through settlement of a threatened strike on the Wabash Railroad in 1885. When Jay Gould, owner of the road, met the workers' demands, the Knights claimed credit for the settlement. Perhaps flushed with the victory, the Knights participated in the eight-hour strike of 1886 that was initiated by trade unions. Several untoward incidents occurred, including the Haymarket Square riot, Chicago, that caused the death of policemen and bystanders through explosion of a bomb said to have been thrown by Anarchists, contributed to the waning of the Knights of Labor membership, which began declining after 1886.

Meantime the Knights' rival, the International Cigarmakers' Union, was gaining in strength, as were other groups of skilled workers.

In 1881 the Federation of Organized Trades and Labor Unions of the United States and Canada, was organized, with Gompers as head of its legislative committee. The primary purpose of the organization seems to have been to obtain legislation beneficial to labor. It demanded prison labor reform, the eight-hour day, legal incorporation for trade unions, and other laws. Experience of earlier labor groups that sought to achieve its ends through politics was re-enacted in the life of the Federation of Organized Trades and Labor Unions. Trade unions evinced only casual interest in national legislation. Gompers' legislative committee, upon instruction of the organization's convention in 1883, requested the national committees of the Republican and Democratic parties to announce their policy on the tenets of the Federation, but did not receive the courtesy of a reply.

Bitterness between skilled workers' groups (trade unions) and the Knights of Labor increased in the middle eighties, the Knights increasing their efforts to absorb trade unions and the craftsmen standing for their right to use their organization to further their own interests. An outstanding clash was with the New York Cigarmakers' Union in which a factional ruction had developed, one faction up-

holding Strasser and Gompers of the International Cigarmakers' Union, and the other (more socialistic), favoring the Knights. As the struggle progressed, the Knights of Labor required its members who were affiliated with the Cigarmakers' Union to quit the Cigarmakers' or be expelled from the Knights of Labor.

Trade unions, finally realizing the danger threatened by the fast-growing Knights of Labor, became more closely affiliated. Gompers was growing in prominence. In 1886 his union sent him to campaign for a more solid federation of trade unions. In the spring of that year the Federation of Organized Trades and Labor Unions called a conference of general trade unions, to be held in Philadelphia in May.

A convention of the Knights of Labor the following October adopted a resolution that commanded its members who were members of the Cigarmakers' International Union to withdraw from that organization, or give up their memberships in the Knights of Labor.

That demand heaped fuel on the fire of animosity already blazing in the ranks of trade unionists. Officials of trade unions met in Columbus, Ohio, December 8, 1886. The Federation of Organized Trades and Labor Unions had changed its meeting to Columbus for December 7. In a body the delegates attended the conference of the officials of the trade unions. The following day the conference became: "The First Annual Convention of The American Federation of Labor."

Gompers was elected president, and, with the exception of one year, continued in that office until his death in 1924.

Designated by some writers as "autocratic" and "imperious," the great Gompers led organized labor to its greatest victories. Under his leadership organized labor for the first time weathered a depression, became a power in the nation's economic life, and demonstrated the sagaciousness of its doctrines.

In 1911 Gompers, and a man whose basic reasoning was the same, were found guilty of violating an injunction in the Buck's Stove & Range Case (Gompers v. Buck's Stove & Range Co.), 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A. (N.S.) 874, sentenced to prison terms for contempt of court, but released on technicalities. The other man was John Mitchell, conservative, who sensed no basic antagonism between employee and employer and advocated policies that promised greater co-operation between them.

Mitchell's definition of a labor organization has been often quoted. He said: "A labor organization is an organization of workmen in one trade who have agreed

among themselves not to bargain individually but to agree to the terms of a collective or joint contract between employer and union."

As national president of the United Mine Workers, Mitchell was a stern advocate of adherence to the union's contracts. Through such a policy the organization gained public esteem, two examples being in 1899 when coal prices soared and miners could have obtained higher wages through a strike, and in the anthracite strike of 1902 when in a special convention the union voted to keep its bituminous miners' agreement with the operators and not go out in sympathy with the anthracite miners.

In its formative years the newly organized American Federation of Labor trod no easy path. It avoided emphasizing legislation and in contrast with the still powerful Knights of Labor, permitted jurisdiction to remain with local unions. Yielding to demands, the Knights of Labor in 1887 granted permission to its members to organize national trade unions. The concession came too late. Skilled workers had begun an exodus to the American Federation of Labor.

Powerful corporations also impeded the progress of the Federation, which in the decade of the nineties learned through hard experience. In that decade the employers turned to the courts in efforts to curb unionism's progress. Labor, personified by the A. F. of L., came through the depression of 1893 somewhat bruised and lacerated, but still in fighting trim. In 1890 decision was made for a strike, trade by trade, for the eight-hour day. The carpenters—largest union affiliated with the Federation—were chosen to make the first demand. As a result of the carpenters' strike threat, union officials claimed to have obtained the eight-hour day in 137 cities and a nine-hour day in most of the other larger cities.

Choice of the miners to make the demand in 1891 was a less fortunate selection. The miners' union had been losing membership and the United Mine Workers had been involved in a strike in the Connelsville coke district. So the plan for an eight-hour strike was discarded.

In 1892 occurred the disastrous Homestead (Pa.) strike. H. C. Frick, long a bitter enemy of unionism, had become chairman of Carnegie Brothers & Co., steel company. The Amalgamated Association of Iron & Steel Workers, rated as the strongest craft union, began negotiations for a new scale of wages. No agreement being reached, a strike began June 29. When 300 men, employed from the Pinkerton Agency to act as guards, attempted to enter Homestead on the morning of July 5, they were met by strikers and their sympathizers. When the battle ended a dozen men had been killed and several dangerously wounded. The steel company not only won the Homestead strike, but drove unionism out of most of the steel mills of the Pittsburgh territory.

In 1894 unionism was to learn that the sympathetic strike is an unstable weapon. Eugene V. Debs, later to be a four-time presidential candidate of the Socialist Party, had organized the American Railway Union on industrial lines. Employees of the Pullman Palace Car Company joined. When a wage dispute arose between the Pullman, Company and its employees the American Railway Union called a railway general strike. Property of an estimated value of $80,000,000 was destroyed. Debs and other officials of the union were arrested and later held in contempt of court. The head of the American Railway Union attracted national attention. Lincoln Steffens in Everybody's Magazine for October, 1908, said of him:

"Debs is keeper of the Socialist Heaven. Locomotive fireman, labor agitator, strike leader, he was jailed once and the Socialists, who take advantage of the misery of men to win them over, converted Debs in his cell at Woodstock.

"And now he is leader of the Socialist party. * * * Debs is the kindest, foolishest, most courageous lover of man in the world."

Eugene Fields wrote of him: "If Debs were a priest, the world would listen to his eloquence and that gentle, musical voice and sad, sweet smile of his would soften the hardest heart."

James Whitcomb Riley put him in verse:
"And there's Gene Debs—a man at stands
And jest holds out in his two hands
As warm a heart as ever beat
Betwixt here and the Judgment Seat."

However his literary admirers may have regarded him, it was Debs who led the bloody strike that involved railroads leading into Chicago. He was charged with conspiracy to kill, was acquitted, and later convicted of contempt of court in that he violated a court injunction. He was a pacifist, and in September, 1918, was convicted of violating the Espionage Act and sentenced to 10 years in the United States Penitentiary at Leavenworth. In 1920, while in prison, he again was nominated for President by the Socialist Party and received 915,302 votes. President Harding commuted his sentence in 1921. Debs died in Elmhurst, Ill., in October, 1926.

Use of the injunction in the Debs-led strike indicated what could be done in opposing strikes. But courts were not the

only agencies involved in the American Railway Union strike. Regardless of the protests of the Governor of Illinois, President Cleveland sent federal troops. The rioting was quelled and the strikers defeated.

The injunction was a common febrifuge but did not appear in struggles between capital and labor until the eighties. As early as 1880 an injunction was applied for in New York but was denied. Johnston Harvester Co. v. Meinhardt, 60 How. Prac.(N.Y.) 168, 171. In 1886 in the railway strike of the Southwest, prohibitive writs were in considerable use. Injunctions issued by federal courts in 1888 in a strike on the Chicago, Burlington & Quincy Railroad received considerable notice. C. B. & Q. R. R. v. Union Pacific R. R.,[1] U. S. Dist. Ct., D. Neb., 1888.

Many of the deeds the court enjoined strikers from committing were forbidden already by criminal laws. Consequently unionism complained that such writs abrogated the old principle that equity will not interfere to prevent crime.

Trade agreement between employers and employees had occurred before 1891, but it was in that year, authoritative labor historians have stated, that the most important of these agreements was entered into. It was between the Iron Moulders and Stove Founders' Association, and has been hailed as "a most important forward step."

Partly because of the 1893–1897 depression few, or none, of such agreements were entered into in the next few years that followed the stove founders' agreement, but better times from 1898 to 1902 caused employers to make such agreements. Among the more important signers with labor were the National Metal Trades' Association, the National Founders' Association, and the Newspaper Publishers.

A general strike by the United Mine Workers in September, 1900, was settled with an "unwritten understanding" as to wage scale. In 1902 the mutability of the set-up created disagreement, the miners asserting that the operators had violated the unwritten contract. They demanded a 20 per cent. increase in wage, reduction of working hours, recognition of their union, and payment conforming to the weight of the coal they mined. On May 9, 1902, more than 150,000 miners quit work when the operators refused to negotiate. In October the miners still were out. A coal famine threatened the nation. President Theodore Roosevelt summoned union officials, and presidents of railroads affected, for a conference in the White House. He urged arbitration. The operators first re-

fused, but after amicable influence by financiers agreed to appointment of a commission. The Anthracite Coal Strike Commission settled the strike, but its award was not made until months later, when the miners were given an increase in wage, a shorter day, and a union member to check weights. The only recognition given the miners' union was that it bear half the expense of a joint arbitration board the Commission established.

Mitchell, president of the miners' union, urged that the award be accepted and by a referendum vote the miners followed his advice.

The anthracite strike impressed the nation with the power of unionized workers.

The close of the century has been called the "honey moon period" of labor. The Anthracite strike is credited with causing many employers' associations to become anti-union, as for example the National Erectors' organized in 1903 which eight years later became an unyielding opponent of the Structural Iron Workers' Union.

In the anthracite field for a decade after the strike in 1902, unions did not develop the strength expected of them.

Not affiliated with the American Federation of Labor, but co-operating with it, are the Big Four Brotherhoods of railway workers—the Brotherhood of Locomotive Engineers; the Brotherhood of Locomotive Firemen and Enginemen; the Brotherhood of Railroad Trainmen, and the Order of Railway Conductors of America. Besides these, numerous organizations of railroad workers are affiliated with the American Federation of Labor, including the "shop crafts," organizations of railroad shop workers whose six national unions reach into industries other than railroads. Extension of those unions into other industries marred an effort by Debs in 1894 to form an industrial union composed entirely of railroad workers.

The Big Four Brotherhoods, resembling British unions formed in the fifties, were organized as mutual benefit and insurance companies shortly after the close of the war between the states. Soon they took up collective bargaining, but refused to join hands with more combative workers' organizations. Their strength increased and was typified in 1916 when through the Adamson Act (45 U.S.C.A. § 65 and note, and § 66), the eight-hour day was demanded by the Brotherhoods and enacted by Congress. The Brotherhoods, sometimes referred to as "the aristocracy of unionism," veered from the path of conservatism after the World War when it

---

[1] No opinion for publication.

endorsed the Plumb Plan for government ownership and operation of railroads.

With return of prosperity in 1898 labor organizations again rapidly expanded. In the following five years, Professor Commons states, they made more important gains than in any other period of their history, although in 1898 the membership of the American Federation of Labor remained virtually the same. The attainments of the Federation in the five-year period beginning with 1898, were lasting, in that they extended into new territory; into unions that had not been affiliated with the Federation; and among the unskilled.

Between 1897 and 1904, ninety-two new national or international trade unions were organized. In this period (1901) came into existence the United States Steel Corporation, adamant foe of unionized labor. Its theory is that adjustment of disputes should be through individual employees and not through employees' organizations. "We do not confer, negotiate with or combat labor unions as such," the late Judge Gary, president of the corporation, stated years ago.

The corporation prided itself upon its welfare work, housing and safety programs, and its pension system.

In 1889 a threat by the Amalgamated Association of Iron and Steel Workers dictated terms to the Carnegie Steel Company. Eleven years later, in the first year of its existence, its successor quickly won a strike. In 1905 the United States Steel Corporation clashed with the Structural Iron Workers' Union and won. In 1919, twenty-four unions gave United States Steel Corporation workers their aid in a strike that lasted three months and was won by the corporation.

The corporation has fought the I. W. W. in its ore mines, the United Mine Workers in its coal mines, and the Lake Seamen's Union on the Great Lakes, as well as the Amalgamated and other craft unions in its sheet and tin plants.

In the social fevers that have intermittently attacked workers of the United States, the penniless who were industrious were able to escape labor troubles when there was free land for them to take up. With disappearance of the frontier, such workers seem to have realized that their well-being depends upon wages. They have abandoned hope of becoming proprietors and in a large measure have turned to organization to further their interests. However, scarcely one-sixth of those who work for wages are within the ranks of unionism. Coxey, leading his unemployed army to Washington, perhaps typified the unorganized worker of an earlier day. The casual worker of the wheat and beet fields, the berry pickers, workers in canning factories, sheep shearers, lumber jacks, ship loaders and common laborers, negroes, farm laborers, and women represent groups that are largely unorganized today. In its time the Knights of Labor attempted to represent that huge group.

Of the nomadic groups that in earning their living move from one end of the country to the other, some found common interest in the Industrial Workers of the World. Classified as a "revolutionary" union, the I. W. W. was organized from membership of the Western Federation of Miners, the Socialist Trade and Labor Alliance, radical groups from the iron and steel industry, the breweries, and the railroads. Syndicalists, Socialists, and Anarchists were included in the delegates that attended the meeting in 1905 in which the I. W. W. was formed. Naturally there was little agreement among the leaders. The Western Federation of Miners withdrew in 1906; the Socialists in 1908. What remained of the organization stood for anarchistic weapons rather than political action. It has never been of much importance in labor movements of the United States, though, like the Knights of Labor, it was given much public notice and its strength overestimated.

The Trade Unity League has been cited as an example of communism in unionism. After 1925, when the railway brotherhoods and the A. F. of L. began casting out the communists, they formed the Trade Unity League as a federation of communistic unions of this country. These organizations have been listed as its members: National Textile Workers' Union; Marine Workers' Industrial Union; Food and Packinghouse Workers' Industrial League; Lumber Workers' Industrial League; Shoe and Leather Workers' National Committee; Auto Workers' Industrial Union; Railroad Workers' Industrial League; Metal Workers' Industrial Union.

In the classification as "Business Unionism" the American Federation of Labor and the "Big Four" of the railway brotherhoods are cited as shining examples. With no quest for ideal perfection, the interest of these organizations almost solely is in acquiring better wages, better working conditions, and shorter hours.

Their interest is in their own industries. Their fundamental principles are collective bargaining.

Critics of the American Federation of Labor assert that it has "failed to adapt itself to the needs of a rapidly changing industry." Its philosophy, the critics say, is "founded upon a concept of industry as

it existed fifty years ago"; that it failed to remodel its organization and policies to changing conditions.

A few years before the United States entered the World War, labor personified by the A. F. of L., was in excellent health. It had won a great victory in the enactment of the Clayton Act in 1914 (38 Stat. 730). In 1916 business was thriving, jobs were plentiful, union memberships much increased, and higher wages obtainable virtually upon request of the unions. When the United States went into the War, Gompers pledged his organization to the nation's aid and was named a member of the advisory commission of the Council of Defense. By 1920 the Federation's membership had reached more than 4,000,000. With readjustment in the post-war decade, labor was confronted with irksome problems. Then came the menace of industrial unionism.

The industrial union is one which embraces every man or woman in an industry, no matter what task he performs. The United Mine Workers of America is such a union; miners, pumpmen, electricians, stablemen, carpenters—every person working in or about the mine—belongs to this single organization. Mine labor, aside from rebellions within the union or secessions, thus presents a solid front. A craft union, on the other hand, is one which enlists only those who do a specific job, i. e. the machinists. This union may enter a plant, pick out the machinists and organize them. Other employees may be organized in other craft unions or not organized at all. There is no co-operation necessarily between various unions which have entered this one plant, and one craft may remain at work while another is striking.

Industrialism meant giving a leg up to the unskilled worker, and had appeared in 1914 to plague the Federation, in the form of the Amalgamated Clothing Workers' Union. Industrialism is a challenge to the craft-minded A. F. of L. Grim, square-jawed John L. Lewis, president of the United Mine Workers, an industrial union, is said to be raising a fund of one and one-half million dollars for organization. He is backed by the Amalgamated Clothing Workers' Union and several other strong industrial unions.

Commentators have predicted that organization of the automobile industry and the employees of the United States Steel Corporation on industrial lines are Lewis's goal. Whether the American Federation of Labor will pass into its history as did the organization it supplanted—the Knights of Labor—is yet to be seen.

Organization of skilled artisans—first to become effective in the futherance of rights of working men—still is the pre-

dominating influence of labor forces. There appears at this writing a sharp division of opinion in labor ranks over industrial and craft unions.

A short time ago, the head of the mightiest labor organization of today was "booed" by workers who did not believe in his theory of craft unions.

The demonstration was the result of an outstanding issue in this country's largest labor organization. That issue is the craft union plan, a fundamental theory of the American Federation of Labor since its birth, as opposed to the industrial union favored by powerful subdivisions of the American Federation of Labor.

Within the past few years, the more aggressive labor organizations have become adherents to the theory that modern mass production requires a broader scope of unionism than craft organizations permit. It appears that the conservative element of the American Federation of Labor still adheres to the craft union theory. Authoritative observers believe that the division of opinion is "the most important labor development in recent decades in America."

The morning edition of the Kansas City Star of February 5, 1936, carried the following editorial:

"Labor at a Turning Point.

"The rebuff to William Green, president of the American Federation of Labor, in his appearance before the United Mine Workers in their Washington convention carries to a further significant stage a division within the ranks of labor that has been increasingly apparent for more than a year. A final break between the more liberal elements represented by the mine workers, headed by John L. Lewis, and the more conservative A. F. of L. seems inevitable. Whether or not this takes the form of outright secession led by Lewis, it will doubtless be the most important labor development in recent decades in America.

"The membership of the United Mine Workers is reported to be 600,000 or 20 per cent of the total of the American Federation of Labor. Membership of the textile, garment and typographers unions, sympathetic with the mine workers, amounts to approximately 400,000, thus bringing the numerical strength of the dissenters to one million or one-third of the A. F. of L. total. Loss of financial and other support from these groups would be a powerful blow to the federation.

"The outstanding question at issue is the craft union plan, traditional with the federation, as opposed to the industrial union represented by the mine workers and favored by Lewis as the basis of further organization of workers. It is the position of the Lewis element that modern mass

production and other developments make the union comprising all members of any industry the only possible effective unit, while the federation claims more advantages for the individual worker in the craft plan, on the basis of which the federation is organized to operate.

"But there are other differences, including the more aggressive organization efforts favored by Lewis and the position taken by the mine workers in indorsement of the new deal—the latter in opposition to the traditionally accepted policy of the federation in holding itself neutral politically. An increasingly vigorous contest between the two elements is in certain prospect. The test of strength will determine whether American labor is to continue its long-prevailing conservatism or is, at least in substantial part, to branch out into new and untried fields."

Whether the more liberal element of this nation's largest labor organization ultimately will break with those who now head that organization, will be watched with interest.

Bibliography:

Labor Problems, Frank Tracy Carlton;

Labor Economics, Dale Yoder;

Labor Problems in American Industry, Carroll R. Daugherty;

The Labor Problems in the United States, E. E. Cummins;

Man's Rough Road, A. G. Keller;

History of International Typographical Union;

History of Trade Unionism in the United States, Selig Perlmann;

The Kansas City Star and other newspapers;

Time, Fortune, The New Republic, Harper's, and other magazines;

Annals of American Academy of Political and Social Science.